JUAN ALVA AND WIFE, ELSA M. ALVA v. WILLIAM HARRILL CLONINGER

No. 8015SC825

(Filed 5 May 1981)

1. **Contracts § 14.2– appraisal contract – no contract for benefit of third person**

There was no merit to plaintiffs' contention that they were entitled to recover on a contract as its intended beneficiaries and that the trial court erred in granting a directed verdict for defendant on plaintiffs' contract claim where the evidence tended to show that plaintiffs entered into a contract to purchase a house; defendant appraised the house pursuant to an agreement with the lending institution to which plaintiffs had applied for a loan in connection with their contract to purchase; the lending institution considered the appraisal and several other factors in processing plaintiffs' loan application; while it was clear that plaintiffs did stand to benefit from a favorable appraisal to the extent that their loan application hinged on the appraisal, such benefit was merely incidental to the purpose of the agreement between the lending institution and defendant; defendant was not instructed by the bank to provide plaintiffs with a copy of the appraisal

Alva v. Cloninger

report, and the bank did not furnish plaintiffs with a copy; and the plaintiffs' evidence did not establish a claim as intended beneficiaries, for there was no recital that the contract was entered into for their direct benefit.

2. **Negligence § 2– contract to appraise house – negligent performance – sufficiency of evidence**

In plaintiffs' action to recover damages from defendant for loss suffered in the purchase of a house which had serious structural defects where plaintiffs alleged that the lending institution from which they sought funds to purchase the house hired defendant to make an appraisal and defendant failed to discover and to disclose in his appraisal report the serious structural defects in the house, the trial court erred in directing a verdict for defendant on plaintiffs' tort claim at the close of plaintiffs' evidence, since one plaintiff's testimony that he discovered numerous defects almost immediately upon moving into the house, coupled with expert opinion testimony that such defects existed at the time of the appraisal, was sufficient to support but not compel a jury's finding that the defects existed when defendant inspected the house; plaintiffs produced expert testimony that an appraiser using due care would have discovered and disclosed such defects; there was evidence from which the jury could have concluded that defendant should have reasonably foreseen and expected that plaintiffs would rely on his appraisal report; the evidence warranted an inference that plaintiffs actually relied on defendant's appraisal report to the lending institution and that defendant's failure to discover and disclose the alleged defects in the house was a proximate cause of plaintiffs' injury; and the evidence presented at trial was therefore sufficient to permit a reasonable inference of negligence, and the case should have been submitted to the jury notwithstanding the lack of privity.

3. **Evidence § 47– duties of appraiser – expert testimony**

In response to properly phrased questions, an expert should be allowed to assist the jury in determining the duties of a competent appraiser.

APPEAL by plaintiffs from *Brewer, Judge.* Judgment entered in Superior Court, ORANGE County, 5 June 1980. Heard in the Court of Appeals 10 March 1981.

Plaintiffs commenced this civil action on 1 June 1979, seeking to recover damages from defendant on alternative theories of contract and tort for economic loss suffered in the purchase of a house that had serious structural defects. Defendant appraised the house pursuant to an agreement with NCNB Mortgage Corporation (NCNB), the lending institution to which plaintiffs had applied for a loan in connection with their contract to purchase. Plaintiffs allege (1) that they contracted in January 1977 to purchase a house in Chapel Hill for $53,000; (2) that the contract was conditioned on their ability to secure a loan for the purchase; (3) that their loan application with NCNB

required an appraisal of the property before the loan could be approved; (4) that they paid NCNB $100 for the appraisal; (5) that NCNB hired defendant to make the appraisal; and (6) that defendant's appraisal report showed (a) the house had a market value of $53,500 and (b) there were "no visible major problems" with the house. Plaintiffs contend that defendant failed to discover, and to disclose in his appraisal report, the serious structural defects to the house; that defendant breached his contract with NCNB when he failed to discover the defects; and that defendant breached his duty to exercise ordinary care by failing to discover the defects.

Defendant, in his Answer, denied that the property was subject to any apparent defects on 2 February 1977 and denied any negligence or breach of contract. As a further defense, defendant alleged that plaintiffs had no standing to sue defendant because there was no privity of contract between defendant and plaintiffs. Defendant contends that the plaintiffs were not third-party beneficiaries to the contract with NCNB and that it was not foreseeable that plaintiffs would be injured if defendant negligently performed his contract with NCNB.

The issues on appeal are whether the court erred in granting defendant's motion for a directed verdict at the close of plaintiffs' evidence and whether the court erred in excluding certain testimony.

Plaintiffs' evidence was as follows. Dr. Juan Alva testified that in January 1977 he contacted a realtor who showed him a house at 600 Yorktown Drive, and that he actually walked through the house twice before signing the contract. After signing the purchase contract, which was conditioned on his receiving a loan, Dr. Alva talked to Roy McGhee, the loan officer at NCNB, who told Dr. Alva that the house would have to be appraised before Dr. Alva's loan application could be approved. Dr. Alva paid NCNB $100 to have the appraisal done. Although the closing was in April 1977, Dr. Alva and his family did not move into the house until June 1977. Almost immediately they began noticing defects. Specifically, Dr. Alva testified:

> After we moved into the house, we did notice something unusual about the house. Actually, it was Elsa who pointed out that the floor in the dining room was sloping and there was a bump on the concrete. And the children told me that

Alva v. Cloninger

they would put little balls on the floor and they would roll out toward the rear. It was sort of like a jigsaw puzzle. I started finding other things, looking around the house and finding cracks in the bricks. It seemed that the whole structure had shifted down, and the entire house was sloping.

. . . .

As I recall, we discovered the defects very fast after moving in ... [f]or instance, the doors would close by themselves. There were bricks covered with some kind of cloth to keep them open, and also the doors in the cabinets in the kitchen, you opened them and they would fall apart. ... In the rear of the house there is a deck. I looked at it and saw several cracks and a separation. The separation, as we were living, actually increased, so we could actually tell that it was getting worse all the time.

In all, plaintiffs presented evidence of twenty-eight separate defects "that existed in June or July of 1977."[1] Plaintiffs testified that they tried unsuccessfully, after June 1977, to get the appraisal report from NCNB and from defendant Cloninger who, by that time, had moved to Kentucky. (Plaintiffs received a copy of the appraisal report after commencing this action.)

In December 1977, at a time when the defendant returned to Chapel Hill, plaintiffs showed defendant the defects they had noticed in the house. Defendant told plaintiffs at that time that if the defects had been there on 2 February 1977 he would have noticed them.

Benjamin Wilson, an engineer employed by Soil Testing Services, inspected plaintiffs' house in January 1979 and found extensive cracks in the masonry and sloping of the floors. He inspected the property again on 2 June 1979 and found additional damage. Ernest F. Parker, Jr., a vice president and principal engineer for Soil Testing Services, testified that he inspected

---

[1] Dr. Alva testified about the twenty-eight defects listed in Plaintiffs' Exhibit No. 1 without objection. Wallace B. Kaufman, who was qualified as an expert in real estate construction and appraisal actually prepared Plaintiffs' Exhibit No. 1 after he inspected the house in 1979. Subsequent to Kaufman's testimony, Plaintiffs' Exhibit No. 1 was received into evidence.

plaintiffs' property on 2 June 1979 with Wilson and determined that the soil supporting the rear foundation wall had compressed, causing the defects. Comparing his observations with the notes from another engineer's inspections in 1978 and 1979, Parker saw only a slight increase in the damage in that one year period. In his opinion, the major part of the settlement of the house would have occurred in the first few years after it was built in 1972, and the cracking would have begun to show within the first year. Parker later testified that the house appeared to be built on fill, and that the nature of the fill material could affect the timing and speed of the house's settlement. (Out of the jury's presence, Parker and Wallace Kaufman, a real estate broker and appraiser, estimated the cost of repairing the house.)

Wallace Kaufman testified (when the jury returned) that he inspected plaintiffs' property in March 1979. Kaufman assumed that the defects were present in February 1977 and, therefore, would have expected defendant to list the defects in his appraisal. In Kaufman's opinion, a competent appraiser exercising reasonable and ordinary care would have included at least the major defects in an appraisal and would have appraised the plaintiffs' property in February 1977 at $38,500. Without the defects, the fair market value in February 1977 would have been $55,000. Kaufman did not personally know the condition of the property on 2 February 1977.

Roy McGhee, a mortgage loan officer at NCNB testified that if an appraisal indicates a major defect, both the realtor and the buyer are advised that either the repairs must be made before closing or the loan will be denied. No defects were mentioned before the closing on 29 April 1977. McGhee further testified that he had found defendant to be a dependable appraiser and that appraisals are done for the bank's benefit in determining whether to lend on the property appraised. If the appraisal had listed the defects, it would have benefited plaintiffs because McGhee would have informed them of the defects.

Defendant testified that when he went back to plaintiffs' house at plaintiffs' request in December 1977, he saw defects in the house that had not been there in February, 1977. The defects were so noticeable that they could not be missed, and he would have listed these defects if they had been there in Febru-

ary 1977. The appraisal he gave NCNB on 2 February 1977 was accurate based on his inspection of plaintiffs' property.

*Epting, Hackney & Long, by Joe Hackney, for plaintiff appellants.*

*Moore & Emmerson, by Joseph I. Moore, Jr., for defendant appellee.*

BECTON, Judge.

[1]  Plaintiffs first contend that the court erred in granting a directed verdict for defendant on plaintiffs' contract claim at the close of plaintiffs' evidence. Plaintiffs argue that they are entitled to recover on the contract as its intended beneficiaries since it was stipulated that "NCNB Mortgage Corporation contracted with defendant to provide an appraisal report and an appraisal fee of $100 was paid to the defendant by NCNB Mortgage Corporation subsequent to the submission of the appraisal report."

According to plaintiffs, there was evidence sufficient to show, prima facie, (1) that defendant breached his contract with NCNB; (2) that defendant was aware that Dr. Alva was the "Borrower/Client"; (3) that defendant was required to inspect the property "inside and out" and report any defect which would impair market value; (4) that the defects which existed at the time of purchase also existed at the time of appraisal; and (5) that defendant failed to report any defects. This evidence, plaintiffs maintain, should have gone to the jury for a determination of whether defendant's failure to report the defects to NCNB constituted a substantial breach of contract.

> "It is well settled in North Carolina that where a contract between two parties is intended for the benefit of a third party, the latter may maintain an action in contract for its breach. ..." [Citations omitted.] An intended beneficiary, despite a lack of privity, may sue on the contract, either for its performance or damages.

*Howell v. Fisher,* 49 N.C. App. 488, 493, 272 S.E. 2d 19, 23 (1980). The test, then, in third-party beneficiary cases, is whether the parties to the contract intended to confer a benefit directly upon the person so claiming, or whether the benefit to the claimant was merely incidental. *Vogel v. Supply Company,* 277

N.C. 119, 128, 177 S.E. 2d 273, 279 (1970); Restatement (Second) of Contracts §133 (1973).

> The American Law Institute's Restatement of Contracts provides a convenient framework for analysis. Third-party beneficiaries are divided into three groups: *donee* beneficiaries, where it appears that the "purpose of the promisee in obtaining the promise of all or part of the performance thereof is to make a gift to the beneficiary"; *creditor* beneficiaries, where "no purpose to make a gift appears" and "performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary"; and *incidental* beneficiaries, where the facts do not appear to support inclusion in either of the above categories. Restatement of Contracts, §133 (1932). While duties owed to donee beneficiaries and creditor beneficiaries are enforceable by them, Restatement of Contracts §§135, 136, a promise of incidental benefit does not have the same effect. "An incidental beneficiary acquires by virtue of the promise no right against the promisor or the promisee." Restatement of Contracts, §147.

277 N.C. at 127, 177 S.E. 2d at 278. "[T]he law in this State as to *direct* third-party beneficiaries is synonymous with the Restatement categories of donee and creditor beneficiaries." (Citations omitted.) 277 N.C. at 127, 177 S.E. 2d at 278.

Plaintiffs fail to demonstrate that they were either "donee" or "creditor" beneficiaries. The appraisal was requested by NCNB to assist NCNB in processing the plaintiffs' loan application. It is important to note that NCNB considers several other factors (for example, credit standing and income) in processing loan applications. So, while it is clear that plaintiffs did stand to benefit from a favorable appraisal to the extent their loan application hinged on the appraisal, such benefit was merely incidental to the purpose of the agreement. Significantly, the defendant was not instructed by NCNB to provide plaintiffs with a copy of the appraisal report, and NCNB did not furnish plaintiffs with a copy. As pointed out above, the mere fact that a third person may receive benefits from a contract between two parties, or suffer damage by reason of a breach thereof, is insufficient to allow the third party to sue for a breach of contract as a third-party beneficiary. We hold, as did this court in

*Howell v. Fisher,* that the plaintiffs' evidence did not establish a claim as "intended beneficiaries ... for there is no recital that the contract was entered into for their direct benefit." (Citations omitted.) 49 N.C. App. at 493, 272 S.E. 2d at 23.

[2]  Plaintiffs' alternative theory — that the trial court erred in directing a verdict for defendant on plaintiffs' tort claim at the close of plaintiffs' evidence — finds support in our case law. First, it is clear as a general matter, that an inference of negligence based on direct or circumstantial evidence may be sufficiently strong to take a case to the jury. *See Lassiter v. Williams,* 272 N.C. 473, 158 S.E. 2d 593 (1968). "[P]laintiff[s] need not directly prove negligence, but must prove facts from which the jury would be warranted in inferring it." *Redding v. Woolworth Co.,* 9 N.C. App. 406, 408, 176 S.E. 2d 383, 384-85 (1970); *appeal after remand,* 14 N.C. App. 12, 187 S.E. 2d 445 (1972). Indeed, "[o]n a motion for judgment of compulsory nonsuit, plaintiff's evidence is to be taken as true, and considered in the light most favorable to him, giving him the benefit of every fact and inference of fact pertaining to the issues which may be reasonably deduced from the evidence." *King v. Bonardi,* 267 N.C. 221, 224, 148 S.E. 2d 32, 35 (1966).

Second, and more particularly, "[a] nonsuit on the issue of negligence should not be allowed unless the evidence is free of material conflict, and the only reasonable inference that can be drawn therefrom is that there was no negligence on the part of defendant, or that his negligence was not the proximate cause of the injury." *Price v. Miller,* 271 N.C. 690, 693, 157 S.E. 2d 347, 349-50 (1967). A directed verdict is seldom appropriate in a negligence case.

Plaintiff Juan Alva's testimony that he discovered numerous defects almost immediately upon moving into the house, coupled with the expert opinion testimony that such defects existed at the time of the appraisal is sufficient to support, but not compel, a jury's finding that the defects did exist when defendant inspected the house. Additionally, plaintiffs produced expert testimony that an appraiser using due care would have discovered and disclosed such defects. We think the evidence presented at trial was sufficient to permit a reasonable inference of negligence, and therefore the case should have been submitted to the jury notwithstanding the lack of privity.

The absence of contractual privity between plaintiffs and defendant is not a bar to plaintiffs recovery in tort. *See* Prosser, Misrepresentation and Third Persons, 19 Vand. L. Rev. 231 (1966). "[S]ound reason dictates that negligence liability be imposed, in appropriate circumstances, to protect the foreseeable interests of third parties not in privity of contract," *Howell v. Fisher*, 49 N.C. App. at 493, 272 S.E. 2d at 23, and therefore, it has long been established that negligent performance of a contract may give rise to an action in tort. "The parties to a contract impose upon themselves the obligation to perform it; the law imposes upon each of them the obligation to perform it with ordinary care and they may not substitute a contractual standard for this obligation." *Toone v. Adams*, 262 N.C. 403, 407, 137 S.E. 2d 132, 135 (1964). *See also* Prosser, Handbook of the Law of Torts § 93, at 622 (4th ed. 1971).

> In several recent cases, this Court has held that a third party, not in privity of contract with a professional person, may recover for negligence which proximately causes a foreseeable economic injury to him. *Condominium Assoc. v. Scholz Co.*, 47 N.C. App. 518, 268 S.E. 2d 12 (1980) (condominium owners may recover for an architect's negligent design of a water pipe system); *Leasing Corp. v. Miller*, 45 N.C. App. 400, 263 S.E. 2d 313, *discretionary review denied*, 300 N.C. 374, 267 S.E. 2d 685 (1980) (equipment lessor may recover for a lawyer's negligent failure to discover the existence of a lien on property used as collateral in a leasing agreement); *Browning v. Levien & Co.*, 44 N.C. App. 701, 262 S.E. 2d 355, *discretionary review denied*, 300 N.C. 371, 267 S.E. 2d 673 (1980) (builders may recover from an architectural firm for negligent overcertification to the construction lender of the amount of work performed by a contractor) [*see also Kornitz v. Earling & Hiller, Inc.*, 49 Wis. 2d 97, 181 N.W. 2d 403 (1970)]; *Industries, Inc. v. Construction Co.*, 42 N.C. App. 259, 257 S.E. 2d 50, *discretionary review denied*, 298 N.C. 296, 259 S.E. 2d 301 (1979) (a contractor may recover for an architect's negligence in approving defective materials and workmanship).

49 N.C. App. at 494, 272 S.E. 2d at 23-24.

In this case, there was evidence from which the jury could have concluded that defendant should have reasonably fore-

seen and expected that plaintiffs would rely on the appraisal report. For example, plaintiffs were named as "Borrowers" on defendant's work-order; plaintiffs paid the fee for defendant's services. By way of further example, defendant had transacted enough similar business with NCNB — 20 to 25 appraisals per month — that he should have been aware of the importance of his appraisals to borrowers and the reliance that borrowers would place thereon. *See Davidson and Jones, Inc. v. County of New Hanover,* 41 N.C. App. 661, 255 S.E. 2d 580, *discretionary review denied,* 298 N.C. 295, 259 S.E. 2d 911 (1979) (soil testing engineers were held liable for damages to third-party contractors who, in submitting their bids, relied on the reports of the engineers, which negligently misrepresented the subsurface soil conditions).

The Restatement of Torts 2d, §552 (1977) provides that:

[o]ne who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

The evidence established prima facie that plaintiffs' reliance upon the appraisal was, or should reasonably have been, expected by defendant. The evidence also warrants an inference that plaintiffs actually relied on defendant's appraisal report to NCNB and that defendant's failure to discover and disclose the alleged defects in the house was a proximate cause of plaintiffs' injury. Dr. Alva testified that the contract to purchase the house was conditioned upon his obtaining financing. The contract to purchase specifically stated "[i]n the event [plaintiffs, after exerting their best efforts to obtain financing, were unable to do so,] this contract shall be null and void." Dr. Alva also testified that he understood the loan was conditioned upon the appraisal and "assumed everything was all right when the loan was approved." Dr. Alva's assumption as to the import of the appraisal was substantiated by the testimony of witness McGhee, the lending officer, who said "[e]ither the repair work had to be done or we would have had to decline the loan application."

Because the evidence of causation was sufficient, when viewed in the light most favorable to the plaintiff, to support a verdict in plaintiffs' favor, the court's directed verdict for defendant was error. *See Young v. Barrier*, 268 N.C. 406, 150 S.E. 2d 734 (1966).

Plaintiffs next contend that the court erred by excluding testimony from Wallace B. Kaufman, an expert real estate appraiser, who was prepared to establish an appraiser's standard of care and testify about the duties of a competent appraiser. Because we reverse on other grounds, and because the record fails to show what Kaufman's answer would have been had he been permitted to testify, no prejudice resulted from the trial court's decision to sustain the objection. Nevertheless, because expert opinion is likely again to be proffered at the retrial, we discuss this and plaintiffs' remaining assignments of error.

[3] Ordinarily, in determining the admissibility of expert testimony, "the only question is whether the particular matter under investigation is one on which the witness can be helpful to the jury because of his superior knowledge." 1 Stansbury, North Carolina Evidence, §134 (2d ed. Brandis rev. 1973). Consequently, in response to properly phrased questions, an expert should be allowed to assist the jury in determining the duties of a competent appraiser. *Alley v. Pipe Co.*, 159 N.C. 327, 74 S.E. 885 (1912). In *Alley*, the plaintiff, a pipemolder in defendant's foundry, was injured by the explosion of a core, which caused a stream of molten iron from the arbor, to strike plaintiff's foot, set his trousers afire, and seriously burn him. The core had been made by a core-maker named Nance. Three witnesses, found by the court to be experts, declared that Nance was an incompetent core-maker. The *Alley* court held: "[w]e think it was proper to admit the opinion of experts upon that disputed question. . . ." 159 N.C. at 330, 74 S.E. at 886. The holding in *Alley* seems applicable to the case *sub judice*.

Citing exceptions numbers seven, eight, and nine, plaintiffs also argue that the court should have allowed testimony regarding the relations between plaintiffs, NCNB and defendant. They contend that such evidence was relevant to establish plaintiffs' status as third-party beneficiaries and to establish their foreseeable reliance. Again, plaintiffs fail to show what the answer would have been if the witness had been allowed to

testify. Moreover, we have reviewed each question to which exception was taken in the context in which the questions were asked and find each question to be narrow in scope and properly sustained. The exclusion of testimony on the narrow questions asked was without prejudice.

Plaintiffs finally argue that the court erred in excluding testimony which they contend was relevant on the issue of damages, regarding the cost of repairing the defects. Although we think the correct measure of damages is "decreased market value" — that is, the difference in market value of what defendant certified plaintiffs were getting and what they actually got — testimony with regard to the actual cost of repair is some evidence — though not controlling — of diminished value. *See generally* Dobbs, Remedies §12.21 (1976); and 22 Am. Jur. 2d, *Damages*, §140 (1965). .

The court erred in directing a verdict for defendant on plaintiffs' tort claim. Accordingly, we

Reverse.

Judge VAUGHN and Judge WELLS concur.