Justice HUDSON,
concurring in part and dissenting in part.
I agree with the majority that these cases arose out of plaintiffs’ purchase of certain real estate and that many of plaintiffs’ claims were properly dismissed under Rule 12(b)(6). However, with respect to plaintiffs’ claims against the appraiser defendants (James Powell, James Powell Appraisals, LLC, and Lynn Rabello) and the BB&T defendants (Branch Banking and Trust Company, and BB&T Collateral Service Corporation), I conclude that the claims for negligent misrepresentation (against appraiser defendants only), for unfair and deceptive acts and practices (UDAP) under Article 1 of N.C.G.S. Chapter 75 (against BB&T defendants only), and for fraud (against both groups) were sufficiently pleaded to survive dismissal. Finally, the trial court dismissed plaintiffs’ claims for civil conspiracy against both sets of defendants because no underlying claims remained. Because I would hold that several claims do survive, I would allow the civil conspiracy claims against these defendants to go forward as well. Accordingly, I respectfully dissent as to these claims only.
*456 Pla.int.ifPs’ Claims against Appraisers
Among other claims against the appraiser defendants, plaintiffs alleged negligent misrepresentation and fraud, both of which include reliance as an element.[1] The majority repeatedly states that plaintiffs have failed to allege reliance; however, review of the complaint shows otherwise. “The tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care.” Raritan River Steel Co. v. Cherry, Bekaert & Holland, 322 N.C. 200, 206, 367 S.E.2d 609, 612 (1988) (citations omitted). In asserting fraud claims plaintiffs must allege that the actions were “made with intent to deceive,” Rowan Cty. Bd. of Educ. v. U.S. Gypsum Co., 332 N.C. 1, 17, 418 S.E.2d 648, 658-59 (1992) (citations omitted). Defendants here argue that without reliance, there can be no actionable deception.
First, we must look at the critical allegations in the complaint related to plaintiffs’ claims for negligent misrepresentation and fraud against the appraiser defendants. For purposes of our Rule 12(b)(6) analysis, we take these allegations as true:
SEVENTH CLAIM FOR RELIEF
(Negligent Misrepresentation— Alternative Claim
- Defendants Powell, James Powell Appraisals and Rabello)
366. Plaintiffs reallege and incorporate by reference all prior allegations of this Amended Complaint.
367. Alternatively, in the course of their business and profession, and in a transaction in which they had a financial interest, the Defendants James Powell Appraisals, Powell and Rabello supplied information to the Plaintiffs’ lender for the benefit of the Plaintiffs, and the Defendants James Powell Appraisals, Powell and Rabello intended for the Plaintiffs and the Plaintiffs’ lender to rely on that information for guidance or benefit in the business transaction.
368. The Plaintiffs’ interest in their overall purchase transaction places them within a limited class to whom *457 the appraisers, the Defendants James Powell Appraisals, Powell and Rabello, owe a duty of due care.
369. The information supplied by the Defendants James Powell Appraisals, Powell and Rabello, in the form of appraisals conducted, was false and misleading.
370. The Defendants James Powell Appraisals, Powell and Rabello failed to exercise reasonable care or competence in obtaining or communicating this false and misleading information.
371. Injury to the Plaintiffs and the other property purchasers in the Coastal Communities subdivisions, as a result of the appraisals conducted, was foreseeable to the Defendants James Powell Appraisals, Powell and Rabello.
372. Through the acceptance of the appraisals by their lender, the Defendant BB&T, the Plaintiffs relied on the false and misleading information supplied by the Defendants James Powell Appraisals, Powell and Rabello, and the Plaintiffs’ reliance was justifiable.
373. The Defendants James Powell Appraisals, Powell and Rabello were aware and/or should have been aware of the importance of the appraisals to the Plaintiffs and the other property purchasers/borrowers in the Coastal Communities subdivisions and the reliance that the Plaintiffs and the other property purchasers/borrowers in the Coastal Communities subdivisions would place thereon.
374. The Plaintiffs’ reliance caused the Plaintiffs to incur financial damage. Had the Defendants James Powell Appraisals, Powell and Rabello disclosed the true facts, including the actual market value of the properties, the Plaintiffs would not have purchased the properties.
375. As a direct and proximate result of the negligent misrepresentation of the Defendants James Powell Appraisals, Powell and Rabello, the Plaintiffs have been damaged in an amount in excess of Ten Thousand Dollars ($10,000.00), with the precise amount to be determined at the trial of this matter.
*458 EIGHTH CLATM FOR RELIEF
(Fraud — All Defendants)
376. The Plaintiffs reallege and incorporate by reference all prior allegations of this Amended Complaint.
377. Under the control and direction of the Defendant Saunders, the agents and employees of various planned residential subdivisions in Brunswick County, North Carolina, including, but not limited to, Rivers Edge sections 9-11,13-15,17-19, promised and promoted seemingly legitimate investments in real estate while in actuality operating a highly successful scheme designed for the benefit of the Defendants Saunders, Gordon, Powell, Rabello, certain employees and/or executives of the Defendant BB&T and the various corporate entities of the Defendant Saunders, including the Defendants Rivers Edge, Coastal Communities, MAS Properties, and TMC, to the damage of the Plaintiffs and countless other property owners.
378. The Plaintiffs were individually approached and specifically targeted by the Defendants Coastal Communities and/or Rivers Edge by direct mail solicitation and special events as promotional techniques to induce likely and prospective purchasers or lessees to visit the subdivision or to purchase or lease a lot in the subdivision.
[[Image here]]
381. In order to accomplish this scheme, under the control and direction of the Defendant Saunders, the agents and employees of the various corporate entities, including the Defendants Rivers Edge, Coastal Communities, TMC, James Powell Appraisals and BB&T, mislead [sic] potential purchasers throughout one or more of the various facets of purchasing the property, arranged for and/or procured the financing for the fraudulent transactions.
382. Each Defendant is joined in this action as a co-conspirator. Liability arises from the fact that each Defendant entered into an agreement with the other Defendants to commit or to participate in the commission of all or part of the unlawful acts, practices, plans, schemes, and transactions to defraud and mislead Plaintiffs and other Coastal Communities property purchasers by: (i) *459 artificially manipulating the values of the properties; (ii) entering into an arrangement with a local appraiser and lender in order to control the appraisal and lending process; (in) using a fraudulent marketing strategy to create the false appearance of high demand and a false sense of urgency to purchase unimproved and undeveloped property with seemingly little risk; (iv) controlling the loan application and settlement process; and (v) misrepresenting the infrastructure and amenities to be developed.
383. Upon information and belief, the agents and employees of the various corporate entities under the control and direction of the Defendant Saunders, including the Defendants Coastal Communities and/or Rivers Edge, employed a marketing strategy to fraudulently lure buyers through the misrepresentation of: (i) the infrastructure and amenities to be developed, (ii) the availability of the property, and (iii) the degree of interest in the property.
384. Upon the Coastal Communities property owners’ visits to the subdivision of Rivers Edge prior to their execution of the Sales Contracts, the Defendants Coastal Communities and/or Rivers Edge presented the Plaintiffs with various marketing materials, community maps, plats and other artistic representations outlining the Master Plan of the development. The information and representations provided by the Defendants Coastal Communities and/or Rivers Edge or their authorized agents, including, but not limited to, the marketing materials exhibited by the Defendants Coastal Communities and/or Rivers Edge at the location and presented to the Plaintiffs, upon which the Plaintiffs relied, indicated inter alia that the subdivision of Rivers Edge offered various amenities, including a southern style clubhouse, property owners clubhouse with outdoor Jr. Olympic sized pool and heated indoor pool, outdoor hot tub, fitness center with steam room and sauna, tennis courts, 27 acre fresh water Palmer Lake with canoeing and kayaking, walking/nature trails and sidewalks through the community, private beach club, and other recreational amenities. Specifically, the new sections of Rivers Edge to be referred to as “Fairway Crossing” would contain an entrance gate, Palmer Lake and surrounding ponds, walking/nature trails and *460 sidewalks surrounding the IIa, 12th, 13th and 14a holes of the Arnold Palmer golf course at Rivers Edge.
[[Image here]]
386. Upon information and belief, the Defendant Saunders and/or the agents and employees of the various corporate entities under the control and direction of the Defendant Saunders, including the Defendants Coastal Communities and/or Rivers Edge, made an arrangement with a local appraiser, the Defendant Powell of the Defendant James Powell Appraisals, to ensure that appraisals would be generated using comparable sales of other properties marketed and sold by the Defendants Coastal Communities and/or Rivers Edge, at inflated prices.
387. Upon information and belief, in order to justify these sales prices for the Coastal Communities properties, the Defendants Powell, Rabello and James Powell Appraisals purposefully failed to consider sales prices for comparable lots outside of the Coastal Communities developments when establishing the appraised value of the lots and appraisals were performed on the property as-is, rather than subject to the extraordinary assumption that the developments would be completed as planned and promised, with infrastructure and amenities.
388. Upon information and belief, the Defendants Powell, Rabello and James Powell Appraisals thereby engaged in the fabrication and use of fraudulently overstated appraisals to justify the financing of Coastal Communities properties.
389. Upon information and belief, the Defendant Saunders conducted and controlled the appraisal process with the Defendants Powell, Rabello and James Powell Appraisals, through the Defendant TMC, a private mortgage brokerage and corporate entity under the control and direction of the Defendant Saunders and the Defendant Gordon, Vice President and managing principal of the Defendant TMC.
390. Upon information and belief, the Defendants concealed their practice of manipulating appraised values from the Plaintiffs and other Coastal Communities *461 property purchasers and utilized this practice at each one of their developments. Therefore, the Plaintiffs and other Coastal Communities property purchasers did not know and had no reason to know that the Defendants had manipulated the appraised value of the property.
[[Image here]]
393. Because the Defendant Saunders and/or the agents and employees of the various corporate entities under the control and direction of the Defendant Saunders, including the Defendants Coastal Communities and/or Rivers Edge, only offered the advertised financial incentives to Plaintiffs who used the services of the Defendants TMC and Gordon and thereafter controlled the lending process through the Defendants TMC and Gordon, it was certain that the Defendant BB&T, the lender participating in the agreement to generate the inflated and manipulated appraisals, would be used.
394. Upon information and belief, the Defendant BB&T approved, funded and handled the loans for the Plaintiffs and the vast majority of Coastal Communities property purchasers from 2004 until 2007 and distributed over 400 million dollars in lot loans to Coastal Communities property purchasers in Brunswick County, North Carolina during this time.
395. Upon information and belief, the Defendant BB&T did not follow either industry standards or their own internal guidelines governing loan origination and underwriting when handling the loan applications of the Plaintiffs or other Coastal Communities property purchasers. The Defendant BB&T approved the majority of the loans without any contact to the applicants to justify the information received and paid the Defendant TMC for the -referrals for each loan application, upon information and belief.
396. For several years, from on or about 2004 until on or about 2007, BB&T regional bankers continued issuing loans for Coastal Communities property owners in the lot loan program in order to meet their own BB&T expanding growth goals regardless of whether the loans should have been approved and/or the properties were being developed *462 by the Defendant Saunders and his various corporate entities as represented to property owners.
397. The Defendant BB&T ensured that the vast majority of lot loans were approved and money disbursed at the closing of the Coastal Communities lot sales, notwithstanding their knowledge of and dependence upon the fraudulently overstated appraisals performed by the Defendant Rabello of the Defendant James Powell Appraisals to justify the inflated amounts of the lot loans, upon information and belief.
398. Upon information and belief, the Defendant BB&T’s regional branch managers and/or loan officers then continued in bad faith to issue loans to the Plaintiffs and other Coastal Communities property purchasers in the lot loan program, relying on fraudulent appraisals, knowing that the loans were under-collateralized and knowing that the infrastructure and amenities of the developments were not being completed as promised, in order to meet their own BB&T expanding growth goals regardless of whether the loans should have been approved and/ or whether the properties were being developed by the Defendant Saunders and his various corporate entities as represented to property owners.
399. All of the Defendants were under a duty to disclose the truth regarding their misrepresentations and concealed material facts of which only they knew or could have known, and to make a full and open disclosure of all such information.
400. The silence and/or omission of the Defendants related to material matters known by the Defendants which they had a legal duty to disclose to the Plaintiffs and other Coastal Communities property purchasers.
401. In addition, the Defendants have taken affirmative steps to conceal material facts regarding the property purchase, appraisal process, and loan process from the Plaintiffs and other Coastal Communities property purchasers, who were unaware and unable to discover these material facts through their reasonable diligence.
*463 402. With regard to the Defendant BB&T, the regional executives mentioned above (Glen Heintz, the regional retail banking manager and Jeff Etheridge, the regional president for BB&T) and local Brunswick County branch managers and/or loan officers (specifically, Brian Walker, Vi Jones, Connie Norton, and others) were under a duty to make such disclosures to the Plaintiffs and other Coastal Communities property purchasers. Instead, the executives, branch managers, and/or loan officers forced through the loan applications and benefited from the increased production from the “lot loan program,” and received higher salaries and/or large yearly bonuses (anywhere from 30% to 100% of their salaries) through the Defendant BB&T’s bonus system.
403. By concealing their conduct designed to artificially inflate the market for the sale of lots in the subdivision, including but not limited to the high-pressure and misleading sales tactics, appraisals that reached apre-deter-mined result and were otherwise deficient and designed to support an inflated purchase price, irregular and deceptive brokerage and lending practices, and affixing of excess revenue stamps to recorded deeds, as alleged herein, all Defendants, in essence, together and by their own acts and omissions, perpetrated a fraud on the market, including the Plaintiffs, which in fact inflated the market.
404. All of the Defendants’ misrepresentations and/ or concealments were reasonably calculated to deceive the Plaintiffs and other Coastal Communities property purchasers, in that all of the Defendants knew their representations and/or concealments were false or were made recklessly, without any knowledge of truth or falsity, as a positive assertion, and where all of the Defendants knew there was a duty to disclose all material facts, or where all of the Defendants were recklessly indifferent to their duty to disclose.
405. The Defendants’ misrepresentations and/or con-cealments were done with the intent to deceive the Plaintiffs, and the Plaintiffs were in fact deceived by these misrepresentations and/or concealments. The Plaintiffs’ reliance on the Defendants’ false representations was reasonable.
*464 406. The Plaintiffs have suffered actual damages as a result of their reliance on all of the Defendants’ false representations and/or concealments. Had any of the Defendants disclosed the true facts, the Plaintiffs would not have purchased the property.
407. As a direct and proximate result of the Defendants’ fraudulent conduct, the Plaintiffs have been damaged in an amount in excess of Ten Thousand Dollars ($10,000.00), with the precise amount to be determined at the trial of this matter.
In my view, these allegations are sufficient to withstand dismissal under existing North Carolina law.
The trial court found as follows:
[ 52] Plaintiffs in this case allege in substance that they indirectly relied on the appraisal reports. However, the North Carolina Supreme Court, in Raritan, held that indirect reliance will not support a claim for negligent misrepresentation.... (Footnote call-number omitted.)
[[Image here]]
[Trial Court summarizes our opinion in Raritan.]
[ 54] In sum, the court in Raritan affirmed dismissal of the plaintiff’s negligent misrepresentation claim because the plaintiff did not directly rely upon the audit report in [sic] which it asserted was defective. Applying Raritan to the present case, Plaintiffs must allege that they relied directly on the appraisal reports themselves in order to plead sufficiently a claim for negligent misrepresentation. 322 N.C. at 205-06. Post-Raritan, claims for negligent misrepresentation that have failed to allege direct reliance have been susceptible to dismissal. (Internal citations omitted.)
[[Image here]]
[Trial Court summarizes the precedent of the Court of Appeals on this issue.]
[ 59] Similar to the purchasers in Williams [v. United Community. Bank, 218 N.C. App. 361, 724 S.E.2d 543 (2012)], Plaintiffs in the instant case purchased lots in *465 undeveloped, proposed residential communities. Further, Plaintiffs allege that Coastal Defendants and the banks controlled the loan and appraisal process. Indeed, the banks procured the appraisals and subsequently approved Plaintiffs’ loan applications. Plaintiffs do not allege that they ever viewed or read the appraisal reports prior to signing their purchase contracts or closing on their loans. Instead, Plaintiffs’ [sic] argue, in conclusory fashion, that they relied on the appraisals “regardless of whether they viewed the appraisal report” because “if the appraisal reports reflected fair market values below the purchase price, none of the Plaintiffs would have moved forward and closed the loan.” More specifically, Plaintiffs allege that “[t]hrough the acceptance of the appraisals by their lender [BB&T], the Plaintiffs relied on the false and misleading information supplied by [Appraiser Defendants], and the Plaintiffs’ reliance was justifiable.” In other words, Plaintiffs contend that they indirectly relied on the appraisal reports because BB&T presumably reviewed the reports and decided to close on their loans, implying that the lots appraised for the value of the loans. Thus, because BB&T decided to close on their loans, Plaintiffs assumed that the appraisal reports supported the loans and were not defective. (Footnote call numbers omitted.)
[ 60] Plaintiffs also allege, like the purchasers in Williams, that if Appraiser Defendants had disclosed any of the flaws in their appraisal reports or if Plaintiffs knew that the lots were overvalued, they would not have closed on their loans, and that they subsequently lost money as a result of the purchases. However, Plaintiffs’ Complaint makes it clear that they were not involved in the appraisal process, which was instead controlled by Coastal Defendants and BB&T. Further, Plaintiffs do not allege that they viewed any of the appraisals prior to signing the purchase contracts, which in any event were not contingent upon the appraised values for the lots. Consequently, Plaintiffs do not, and cannot, allege that they ever relied upon any appraisal of the property before they agreed to purchase said property. Moreover, Plaintiffs do not allege that they viewed the appraisals before closing on their loans with BB&T. Actual reliance is particularly lacking as to certain Plaintiffs who allege that their appraisal was *466 performed after they closed on the loans. (Footnote call numbers omitted.)
I do not agree with the trial court’s interpretation of Raritan River Steel, although I recognize that it is the interpretation adopted by the Court of Appeals. However, we are not bound by that precedent, and I conclude that common sense and the plain language of our precedent lead to a contrary result. Consequently, I would hold that the allegations of reliance here are adequate to support these claims.
In 1981 the Court of Appeals decided Alva v. Cloninger, 51 N.C. App. 602, 277 S.E.2d 535 (1981). The plaintiffs there bought a house that turned out to have serious structural defects. Id. at 603-05, 277 S.E.2d at 536-37. They filed suit against the appraiser, seeking damages. Id. at 603, 277 S.E.2d at 536. The defendant argued that he could not be liable for negligence because the plaintiffs were not in privity of contract with him. Id. at 604, 277 S.E.2d at 537. The Court of Appeals disagreed, noting that
[t]he evidence established prima facie that plaintiffs’ reliance upon the appraisal was, or should reasonably have been, expected by defendant. The evidence also warrants an inference that plaintiffs actually relied on defendant’s appraisal report to NCNB and that defendant’s failure to discover and disclose the alleged defects in the house was a proximate cause of plaintiffs’ injury. Dr. Alva testified that the contract to purchase the house was conditioned upon his obtaining financing.... Dr. Alva also testified that he understood the loan was conditioned upon the appraisal and “assumed everything was all right when the loan was approved.” Dr. Alva’s assumption as to the import of the appraisal was substantiated by the testimony of witness McGhee, the lending officer, who said “[e]ither the repair work had to be done or we would have had to decline the loan application.”
Id. at 611, 277 S.E.2d at 541 (alteration in original). Under the reasoning in Alva, plaintiffs here would have a claim against the appraiser defendants.
The question then becomes whether this Court’s decision in Raritan River Steel overturned Alva. In my view, the answer is no. First, the facts of each case are distinguishable: Alva dealt with a situation similar to the one we have here — real estate appraisals — whereas Raritan involved auditors and financial reports. In Raritan, the plaintiff alleged that it obtained the information it used to value a company not from *467 an actual audit of that company, but from information contained in a report prepared by a third party. Raritan, 322 N.C. at 205, 367 S.E.2d at 612. Given those facts, this Court “conclude[d] that a party cannot show justifiable reliance on information contained in audited financial statements without showing that he relied upon the actual financial statements themselves to obtain this information.” Id. at 206, 367 S.E.2d at 612. Second, that conclusion was based
in part from an understanding of the audit report. . . . Isolated statements in the report, particularly the net worth figure, do not meaningfully stand alone; rather, they are interdependent and can be fully understood and justifiably relied on only when considered in the context of the entire report, including any qualifications of the auditor’s opinion and any explanatory footnotes included in the statements.
Id. at 207, 367 S.E.2d at 613.
While the Court of Appeals has subsequently interpreted this precedent as requiring direct reliance in all negligent misrepresentation claims, see, e.g., Fazzari v. Infinity Partners, LLC, _ N.C. App. _, 762 S.E.2d 237 (2014), I am not convinced our holding in Raritan should be read so narrowly. Instead, I am more inclined to follow the reasoning in Alva. Nothing in Raritan mandates direct reliance — Raritan only mandates actual reliance. There the auditor relied on a summary of the information contained in the report. Here the complaint alleges that the appraiser defendants fabricated and overstated appraisals, and concealed from plaintiffs this conduct, all of which became the basis for the approval of financing for plaintiffs’ purchases. In this way, plaintiffs allege they relied on the appraisals, regardless of whether they personally viewed them. Additionally, unlike the summary report relied upon by the plaintiff in Raritan, the appraisals here are more like the audit of the original company that we concluded the plaintiff must have actually relied upon there in order to establish a claim. Plaintiffs here did not rely on “[isolated statements” from a summary but rather on “the entire report.” See Raritan, 322 N.C. at 207, 367 S.E.2d at 613.
Additionally, in Raritan, id. at 203, 209-10, 214-16, 367 S.E.2d at 611, 614-15, 617-18, this Court referenced the Restatement (Second) of Torts, a comment to which is pertinent here and states:
g. Information supplied directly and indirectly. The person for whose guidance the information is supplied is often the person who has employed the supplier to *468 furnish it, in which case, if it is supplied for a consideration paid by that person, he has at his election either a right of action under the rule stated in this Section or a right of action upon the contract under which the information is supplied. In many cases, however, the information is supplied directly to the person who is to act upon it although it is paid for by the other party to the transaction. Thus, when a vendor of beans employs a public weigher to weigh beans, the weigher, who gives to the vendee a certificate which through his carelessness overstates the weight of the beans, is subject to liability to the vendee for the amount that he overpays in reliance upon the certificate. However, direct communication of the information to the person acting in reliance upon it is not necessary. In the situation above the liability of the weigher would not be affected by his giving the certificate to the vendor for communication to the vendee.
Restatement (Second) of Torts § 552 (titled “Information Negligently Supplied for the Guidance of Others”) (cmt. g (Am. Law Inst. 1977)) (emphasis added). Here the appraisers are comparable to the “weigher” and their liability is “not... affected by [their] giving the certificate [appraisal] to the vendor [BB&T] for communication to the vendee [plaintiffs].”
Further, this conclusion is bolstered by common sense and everyday experience. When buying a house, parties commonly understand that unless the house appraises for the contract price (at least), the lender will not approve a loan to finance the purchase. Therefore, even though the appraisers here were hired by the lender, to which it supplied the appraisals, plaintiffs allege that the appraisals were essential to the transaction and were relied upon by the parties to the purchase. In my view, the better reasoned approach allows such reliance to be either direct, if the buyer actually sees the appraisal, or indirect, as here. And when, as here, the plaintiffs have specifically and repeatedly alleged such reliance, I would hold that the claims can proceed.
Applying these principles here, I would allow plaintiffs’ claims for negligent misrepresentation and fraud to go forward because plaintiffs have sufficiently pleaded all necessary elements, including reliance.[2] In *469 my opinion, these allegations are sufficient to survive a Rule 12(b)(6) motion to dismiss.
Plaintiffs’ Claims against BB&T
Because it appears that under the Mortgage Lending Act (MLA), N.C.G.S. 53-243.11, the lender here owed a duty to these plaintiffs, I would allow several of plaintiffs’ claims which allege this duty as a basis for liability on the part of BB&T to go forward. N.C.G.S. § 53-243.11 (2005) (repealed 2009 and recodified as amended at N.C.G.S. §§ 53-244.010 to 53-244.121).
Initially, I disagree with the majority’s assertions that plaintiffs’ purchases of these properties in residential communities fall outside the scope of the MLA. As amended and recodified in N.C.G.S. § 53-244.020, the purpose of the MLA is as follows:
(a) Purpose. - A primary purpose of this Article is to protect consumers seeking mortgage loans and to ensure that the mortgage lending industry operates without unfair, deceptive, and fraudulent practices on the part of mortgage loan originators. Therefore, the General Assembly establishes within this Article an effective system of supervision and enforcement of the mortgage lending industry by giving the Commissioner of Banks broad administrative authority to administer, interpret, and enforce this Article and adopt rules implementing this Article in order to carry out the intentions of the General Assembly.
(b) Construction. - It is the intent of the General Assembly that provisions of this Article be liberally construed to effect the purposes stated or clearly encompassed by the Article.
Id. § 53-244.020 (2013).[3] Plaintiffs allege in their complaint that they sought mortgage loans for these purchases and that “BB&T at all times relevant herein was acting as a mortgage lender pursuant to [the MLA].”
*470 The statute in effect during the events at issue here defined “[residential real property” as “[r]eal property located in the State of North Carolina upon which there is located or is to be located one or more single-family dwellings or dwelling units.” Id § 53-243.01(19) (2005). The majority opinion, as well as the complaint and the trial court, repeatedly refer to plaintiffs’ purchases of real property in planned residential developments. The majority’s assertion that the MLA does not apply because plaintiffs “could not have used the property for residential purposes at the time of purchase” cannot be accurate; people frequently buy lots upon which to build residences, and the MLA surely applies to them. Additionally, despite the majority’s repeated characterization of plaintiffs as “investors,” the complaint alleges no such thing. None of the plaintiffs are described as an “investor” in the complaint; instead each of the plaintiffs is described as an individual “citizen and resident” who purchased property in a Brunswick County “subdivision” at issue here. The only instances in which “investments” are mentioned are in plaintiffs’ allegations that defendants marketed the lots as a “good investment.” That the lots, if properly developed, could have been a sound investment does not deprive these purchases of their residential nature, nor does it remove them from within the scope of the MLA. In fact, for most people, their residence is their largest “investment,” and the MLA is designed to protect that. Any duty arising out of the MLA should apply to the facts alleged here.
On this issue the trial court concluded:
[ 16] The gravamen of Plaintiffs’ Claims againstBB&T is that the Bank had a duty under the MLA to appraise the collateral for the loans and inform Plaintiffs of the details of the loan process including Saunders’ alleged involvement and selection of JPA as the appraiser. All of the Claims against BB&T are premised upon wrongful omissions by BB&T regarding the loan and appraisal processes, including Saunders’ alleged involvement and control over both.
[ 17] In the Preliminary Injunction Order, the court concluded that Plaintiffs failed to allege facts sufficient to show that BB&T acted improperly in issuing loans to purchasers of Coastal Communities Properties. The court noted that in an ordinary debtor-creditor relationship, a lender does not owe any duty to its borrower beyond the terms of the loan agreement. “[P]arties to a contract do not thereby become each others’ fiduciaries; they *471 generally owe no special duty to one another beyond the terms of the contract...Branch Banking & Trust Co. v. Thompson, 107 N.C. App. 53, 61 (1992). “A lender is only obligated to perform those duties expressly provided for in the loan agreement to which it is a party.” Lassiter v. Bank of North Carolina, 146 N.C. App. 264, 268 (2001). (Footnote call numbers omitted.)
[ 18] BB&T did not owe Plaintiffs a duty to disclose the details of the loan process not required to be disclosed under state or federal law or under the terms of the loan agreements. BB&T acted properly in issuing loans to Plaintiffs and did not violate any duties owed to Plaintiffs under the terms of the loan agreements. The court CONCLUDES that when measured under the standards of Rule 12(b)(6), the allegations in Plaintiffs’ Amended Complaints can not support their Claims against BB&T.
I disagree. Under N.C.G.S. § 53-243.11, it was prohibited for a lender
(1) To misrepresent or conceal the material facts or make false promises likely to influence, persuade, or induce an applicant for a mortgage loan or a mortgagor to take a mortgage loan, or to pursue a course of misrepresentation through agents or otherwise.
[[Image here]]
(8) To engage in any transaction, practice, or course of business that is not in good faith or fair dealing or that constitutes a fraud upon any person, in connection with the brokering or making of, or purchase or sale of, any mortgage loan.
[[Image here]]
(11) To influence or attempt to influence through coercion, extortion, or bribery, the development, reporting, result, or review of a real estate appraisal sought in connection with a mortgage loan.
N.C.G.S. § 53-241.11 (2005). The Court of Appeals has held that this statute created a legal duty owed to buyers. Guyton v. FM Lending Servs., Inc., 199 N.C. App. 30, 681 S.E.2d 465 (2009). There the conduct alleged was that the lender had withheld information that the property purchased by the plaintiffs lay in a flood plain. The plaintiffs sued for *472 fraud, negligent misrepresentation, and unfair and deceptive trade practices. Id. at 33, 681 S.E.2d at 469. The Court of Appeals reasoned that, “[although N.C. Gen. Stat. § 53-243.11 does not directly address the specific set of factual circumstances present in this case, we conclude that this statutory provision was intended to protect buyers against the sort of activity that is alleged to have occurred here.” Id. at 43, 681 S.E.2d at 475. The court concluded:
Assuming that Defendant did, in fact, engage in the conduct described in Plaintiffs’ complaint, Defendant would have clearly violated N.C. Gen. Stat. § 53-243.11. As a result, there is ample basis in North Carolina law . . . for concluding that Defendant would have violated a legal duty owed to Plaintiffs if it acted as described in Plaintiffs’ complaint.
Id. at 44, 681 S.E.2d at 476. This reasoning equally applies here.
Plaintiffs assert claims for fraud and unfair and deceptive trade practices against BB&T, alleging that:
99. Upon information and belief, the Defendant Saunders and/or the agents and employees of the various corporate entities under the control and direction of the Defendant Saunders, including the Defendants Coastal Communities and/or Rivers Edge, made an arrangement with local lenders, including the Brunswick County, North Carolina, regional office of BB&T, to ensure that the lenders would rely upon the previously described appraisals which manipulated property values.
100. In addition, the Defendant BB&T financed early lot sales in the various undeveloped subdivisions with transactional values under $250,000.00, waiving the requirement of a full appraisal in most cases.
101. Upon information and belief, the Defendant BB&T’s waiver of a full appraisal for the lots with transactional values of under $250,000.00 did not comply with the requirements of the North Carolina Administrative Code and/or the Defendant BB&T’s own internal underwriting guidelines.
[[Image here]]
*473 112. Upon information and belief, the Defendant BB&T approved, funded and handled the loans for the vast majority of Coastal Communities property purchasers from 2004 until 2007 and distributed over 400 million dollars in lot loans to Coastal Communities property purchasers in Brunswick County, North Carolina during this time.
113. Upon information and belief, the Defendant BB&T did not follow either industry standards or their own internal guidelines governing loan origination and underwriting when handling the loan applications of the Coastal Communities property purchasers.
114. The Defendant BB&T employs a standard practice whereby all loan applications submitted must be approved through their Central Underwriting department in Winston[-]Salem, North Carolina, upon information and belief. Nevertheless, upon information and belief, the decisions of the Defendant BB&T’s Central Underwriting department may be overridden by the regional branches if deemed necessary on a case-by-case basis.
115. In the instant case, upon information and belief, many of the loan applications of the Coastal Communities property purchasers were turned down at BB&T’s Central Underwriting department as a result of gaps in information, debt to income ratio and/or credit histoiy in the loan applications of the Coastal Communities property purchasers submitted by TMC.
116. However, upon information and belief, Glen Heintz, the regional retail banking manager for the Defendant BB&T (for the region encompassing Brunswick County, North Carolina) and/or Jeff Etheridge, the regional president for the Defendant BB&T (for the region encompassing Brunswick County, North Carolina), chose to override the majority of the declines and approve the loan applications regardless of any issues or concerns noted in the applications by the Defendant BB&T’s Central Underwriting department.
117. As a result, in or about 2005, the Defendant BB&T’s Central Underwriting department declined to *474 review the loan applications of the Coastal Communities property purchasers from the Brunswick County region altogether because they determined that the Brunswick County region would override the majority of the declines and approve the loan applications regardless of their decisions, upon information and belief.
118. Upon information and belief, following this change in policy, BB&T Branch Managers throughout Brunswick County, specifically, Brian Walker, Vi Jones and Connie Norton, employed a “no phone call” policy in order to handle the 'numerous faxed applications being submitted by the Defendants TMC and Gordon (referred to hereinafter as “the lot loan program”).
119. Upon information and belief, the loan applications were thereafter “forced through” and approved by the Defendant BB&T without any contact to the applicants to justify the information received.
120. The Defendant BB&T thereafter paid the Defendant TMC for the referrals for each loan application, upon information and belief. At the height of the program, the Defendant BB&T paid the Defendant TMC as much as $15,000.00 to $20,000.00 per month for the referrals, upon information and belief.
121. The above mentioned BB&T executives purposefully shifted the work with the “lot loan program” to younger retail lenders that were less inclined to question the internal adjustments made specifically for the program, upon information and belief.
[[Image here]]
125. Thereafter, upon information and belief, the Defendant BB&T’s regional branch managers/loan officers continued issuing loans for Coastal Communities property owners in the lot loan program in order to meet their own BB&T expanding growth goals regardless of whether the loans should have been approved and/or the properties were being developed by the Defendant Saunders and his various corporate entities as represented to property owners
*475 [[Image here]]
127. Upon information and belief, the Defendant BB&T continued in bad faith to provide loans to the Plaintiffs and other Coastal Communities property owners in the lot loan program, relying on fraudulent appraisals and knowing that the infrastructure and amenities in all of the developments were not being completed as promised.
[[Image here]]
135. Instead, the Defendant BB&T failed to maintain adequate and appropriate compliance reviews of the appraisals which would have easily alerted the Defendant BB&T that the appraisals were flawed and the lot prices were inflated, upon information and belief. If, in fact, compliance reviews were performed, the Defendant BB&T knew or should have known that the reviews were performed in an inadequate and inappropriate manner, upon information and belief.
Like in Guyton, if we take these allegations as true, they certainly suffice to support a conclusion that BB&T breached a duty to plaintiffs here and therefore, any claims requiring such a duty as an element, as well as claims under Chapter 75, should be allowed to go forward.[4]
In sum, for the above reasons, I would allow plaintiffs’ claims against the appraiser defendants for negligent misrepresentation and fraud to proceed, as well as plaintiffs’ claims for fraud and for unfair and deceptive acts or practices under Chapter 75 to go forward against the BB&T defendants. Moreover, based on reviving these claims, I would allow the claims of civil conspiracy to proceed as to both sets of defendants.
Accordingly, I respectfully dissent from the majority opinion as to these claims only. I concur with the majority’s decision regarding the remaining claims asserted by plaintiffs and addressed in the majority opinion.
Justice BEASLEY joins in this concurring in part, dissenting in part opinion.

. Plaintiffs also alleged claims against the BB&T defendants for fraud and unfair acts and practices under N.C.G.S. Chapter 75. These claims are discussed more extensively below, but any reliance elements contained in them should survive based on the following discussion.

. This reasoning does not apply to plaintiffs who closed on their loans before the appraisal was completed. In that case, I do not include these plaintiffs as those who can show reliance (even indirectly).

. Although this language was not included in the version of the MLA in effect at the times pertinent to these events, most of the remaining language is identical or similar, tending to indicate a similar remedial purpose. See, e.g., O & M Indus. v. Smith Eng’g Co., 360 N.C. 263, 268, 624 S.E.2d 345, 348 (2006) (“A remedial statute must be construed broadly ‘in the light of the evils sought to be eliminated, the remedies intended to be applied, and the objective to be attained.’ Puckett v. Sellars, 235 N.C. 264, 267, 69 S.E.2d 497, 499 (1952).”).

. I am not inclined to go so far as to hold that the Mortgage Lending Act creates its own cause of action, however. Thus, I would hold that plaintiffs’ claims on that cause were properly dismissed.