IN THE SUPREME COURT OF NORTH CAROLINA

No. 375A14

Filed 18 December 2015

KENNETH ARNESEN, KRISTEN CHANEY, STEVE CHANEY, DEBORAH CHARUK, WILLIAM CHARUK, MARIA CURATOLO, KATHLEEN JORDAN, THOMAS JORDAN, TANNER MARKLEY, JOHN MERRITT, BARRY MCGOFF, JOEL SCHENKEL, JOHN SWAN, LINDA SWAN, AUDREY VARNUM, RICHARD VARNUM, ALAN WALBAUM, CAMILLE WALBAUM, and LUCAS WILSON

v.

RIVERS EDGE GOLF CLUB & PLANTATION, INC., RIVERS EDGE GOLF CLUB & PLANTATION, LLC, COASTAL COMMUNITIES, INC., MARK A. SAUNDERS, DONALD HOWARTH, MAS PROPERTIES, LLC, THE MORTGAGE COMPANY OF BRUNSWICK, INC., BRENDAN GORDON, JAMES POWELL, JAMES POWELL APPRAISALS, LLC, LYNN RABELLO, BRANCH BANKING AND TRUST COMPANY, BB&T COLLATERAL SERVICE CORPORATION, BAXLEYSMITHWICK PLLC, and DOUGLAS BAXLEY

Appeal pursuant to N.C.G.S. § 7A-27(b)(1) from opinions and orders granting motions to dismiss entered on 27 June 2011 and 13 June 2012 by Judge John R. Jolly, Jr. in Superior Court, Brunswick County. On 10 October 2014, pursuant to N.C.G.S. § 7A-31(a) and (b)(2), and Rule 15(e)(2) of the North Carolina Rules of Appellate Procedure, the Supreme Court on its own initiative certified the case for review prior to determination in the Court of Appeals. Heard in the Supreme Court on 18 March 2015.

> *Hodges & Coxe, P.C., by C. Wes Hodges, II and Sarah R. Buzzard, for plaintiff-appellants.*

> *Teague, Campbell, Dennis & Gorham, LLP, by Jacob H. Wellman and Natalia K. Isenberg, for defendant-appellees James Powell, James Powell Appraisals, LLC, and Lynn Rabello.*

*Poyner Spruill LLP, by J. Nicholas Ellis and Caroline P. Mackie, for defendant-appellees Branch Banking and Trust Company and BB&T Collateral Service Corporation.*

NEWBY, Justice.

In this case we consider whether plaintiffs, individual investors in undeveloped real estate, may recover against a bank and its appraisers for their alleged participation in a scheme to defraud investors by artificially inflating property values in the years preceding the national real estate crisis. Plaintiffs allege, essentially, that they would not have purchased certain real property but for faulty appraisal information and that, in any event, the bank should have discovered and disclosed the inflated appraised property values to them. The complaint reveals that plaintiffs did not view, receive, order, or even inquire about an appraisal before purchasing the property, nor that their purchases were contingent upon an appraisal, faulty or not. Because no legal duty exists at law between a debtor and creditor, or between a bank's appraisers and a purchaser, plaintiffs' claims, as pled, fail. Moreover, because plaintiffs fail to sufficiently allege justifiable reliance upon the faulty appraisal information, or lack thereof, or that plaintiffs' injuries were proximately caused by either the bank or the appraisers, dismissal is proper.

Plaintiffs are purchasers of undeveloped real property located in one of several planned residential communities in Brunswick County, North Carolina, developed

and marketed by defendant Mark A. Saunders (collectively, Coastal Communities).[1] Like many others throughout the nation, plaintiffs invested in real property shortly before the collapse of the real estate market. Taking the well-pled allegations in plaintiffs' complaint as true, the record reveals the following:

In 2004 Saunders, a real estate developer, began marketing lots in the Coastal Communities. Saunders purchased unimproved real property through his company, MAS Properties, LLC, subdivided the property into lots, and then deeded the parcels to various corporate entities for sale to investors. During the "pre-development stage" of the proposed subdivisions, Saunders marketed the undeveloped lots with plans to improve them within two years after purchase.

On 8 August 2005, Saunders, acting through MAS Properties, purchased approximately one hundred acres of land in Shallotte Township, Brunswick County, North Carolina. Eleven days later, MAS Properties transferred the property to Rivers Edge Golf Club & Plantation, Inc. (Rivers Edge),[2] which became the basis for the investments at issue here. Rivers Edge recorded various subdivision plats thereafter, continuing through 2006.

---

[1] The communities include the following residential subdivisions located in Brunswick County, North Carolina: Ocean Isle Palms, Ocean Ridge Plantation, Rivers Edge, and SeaWatch at Sunset Harbor. Plaintiffs allege Saunders acted individually and through his various corporate entities.

[2] Rivers Edge Golf Club & Plantation, LLC and Rivers Edge Golf Club & Plantation, Inc. are referred to interchangeably as "Rivers Edge" throughout the complaint.

Saunders marketed the Rivers Edge property to potential investors through various promotional materials and sales events, including invitation packages, brochures, community maps, and artistic representations. These artistic renditions included maps and sketches of planned community amenities, like "a southern style clubhouse," "pool, outdoor hot tub, [and] fitness center," "walking/nature trails and sidewalks," and "other recreational amenities." Saunders invited investors to special predevelopment marketing events designed to drive sales. For example, he hosted a "big tent" event with food and music to kick off the Rivers Edge development and implemented a lottery system to give interested investors priority selection over lots. "[P]rospective purchasers were urged to execute a 'Homesite Reservation' and submit a 'Reservation Deposit' amounting to up to 10% of the purchase price of the property selected in order to have their names placed in the Priority Selection drawings." According to the Homesite Reservation document, the ten-percent deposit would be applied toward an earnest-money down payment for the purchase of the underlying property.

Saunders offered various financial incentives to promote business, including "pre-development pricing," payment by the developer of two years of interest on lot financing, "and $400 to $500 toward closing costs." Saunders furnished prospective investors a detailed "HUD Property Report" and additional materials that disclosed a variety of details including the development plans, construction guidelines, and estimated timelines. All of these documents were provided in a large binder

containing several hundred pages. A series of property reports included the current status of construction and amenities and many of these documents disclosed significant delays. Investors were asked to sign a document acknowledging "that they had received a copy of the Property Report and [had been] given an opportunity to read the Property Report before signing any contract or agreement." Plaintiffs state that they purchased the vacant properties from Saunders, marketed for their "good investment potential," and relied on his representations that the undeveloped properties were "a financially sound investment that offered little risk."

Plaintiffs characterize Saunders's marketing strategies as creating a "false sense of urgency for potential buyers to purchase the undeveloped property with seemingly little risk." Plaintiffs assert that Saunders's agents and employees "encouraged the Plaintiffs and other prospective buyers to purchase more than one lot" and that Saunders marketed the invitation events as "exclusive," when in reality "hundreds, if not thousands," were invited. Plaintiffs allege Saunders "pushed" his sales assistants "to go out in teams and pretend to be sales agents and interested buyers during sales events and property showings" and that Saunders "required [his sales assistants] to drive Range Rovers or other expensive Sports Utility Vehicles."

From 2004 to 2007, defendant Branch Banking and Trust Company (BB&T)[3] served as primary lender for the majority of Saunders's real estate investors who

---

[3] BB&T Collateral Service Corporation served as trustee on the deeds of trust securing the loans issued by Branch Banking and Trust Company and also is a named

sought bank financing, including plaintiffs. As Saunders's business grew, he established The Mortgage Company of Brunswick, Inc. (TMC), a private mortgage brokerage, to help facilitate the lending process. TMC thereafter assisted Saunders's investors through the loan application process and referred them to BB&T, which then paid TMC a fee for each referral. Internally, BB&T engaged a local firm, James Powell Appraisals, LLC (the Appraisers),[4] to prepare appraisals on some of the properties. The bank did not require full appraisals on the early lot sales with transaction values less than $250,000. Of the limited number of appraisals that BB&T did obtain, the bank used them for its own internal underwriting purposes.

From May 2005 through the summer of 2006, each plaintiff reserved one or more properties during a sales event at Rivers Edge and executed a sales contract. After executing the sales contract and obligating themselves to purchase the property, each plaintiff financed his or her investment with a loan through BB&T. Plaintiffs received a full Property Report sometime during the transaction but deny having the opportunity to read it before signing a sales contract. Rivers Edge provided plaintiffs financial incentives consisting of payments for two years of interest and $400 to $500 credits at closing.

---

defendant. Both defendants are collectively referred to as "BB&T" throughout this opinion.

[4] James Powell Appraisals, LLC was formed in 2007. Prior to that time James Powell Appraisals operated as a sole proprietorship. James Powell employed defendant Lynn Rabello. Collectively these parties are referred to as "the Appraisers."

On 26 March 2010, two years after the collapse of the national real estate market and four to five years after their initial investment, plaintiffs commenced this action asserting eighteen claims against Saunders, his various companies, BB&T, and the Appraisers.[5]  Each of plaintiffs' claims as stated incorporates by reference and is based in part upon the following allegations:

> 40. The Defendant Saunders, through the corporate identity of the Defendant MAS Properties, purchased undeveloped and unimproved parcels of real property throughout Brunswick County, North Carolina and thereafter partitioned the property into lots of proposed subdivisions.  The Defendants Saunders and MAS Properties then deeded the property to one of the Defendant Saunders' various corporate entities, including the Defendant Rivers Edge.  Under the control and direction of the Defendant Saunders, the agents and employees of the various corporate entities, including the Defendants Rivers Edge and/or Coastal Communities, thereafter marketed the subdivisions and immediately resold the lots to purchasers at grossly inflated prices.
>
> . . . .
>
> 84. Upon information and belief, the Defendant Saunders and/or the agents and employees of the various corporate entities under the control and direction of the Defendant Saunders, including the Defendants Coastal Communities and Rivers Edge, made an arrangement with a local appraiser, James Powell of James Powell Appraisals, LLC, to ensure that appraisals would be generated as described above, using comparable sales of other properties marketed and sold by the Defendant Coastal Communities, including property in Rivers Edge, at the inflated prices.

---

[5] Plaintiffs' amended complaint includes eighteen causes of action.  The Chief Justice designated the action as a mandatory complex business case on 7 April 2010.

. . . .

90. Upon information and belief, the Defendants Powell and Rabello thereby engaged in the fabrication and use of fraudulently overstated appraisals to justify the financing of Coastal Communities properties.

. . . .

98. The Plaintiffs and other property owners relied upon the Defendants' misrepresentations when purchasing property, and paying inflated prices for the property, within one or more of the undeveloped subdivisions. Absent the Defendants' misrepresentations, Plaintiffs and other property owners would not have purchased the property from the Defendants.

. . . .

99. Upon information and belief, the Defendant Saunders and/or the agents and employees of the various corporate entities under the control and direction of the Defendant Saunders, including the Defendants Coastal Communities and/or Rivers Edge, made an arrangement with local lenders, including the Brunswick County, North Carolina, regional office of BB&T, to ensure that the lenders would rely upon the previously described appraisals which manipulated property values.

Plaintiffs assert the following claims against BB&T: (1) fraud, (2) unjust enrichment, (3) violation of North Carolina's RICO statute, (4) breach of duty of good faith and fair dealing/negligent supervision, (5) unfair and deceptive trade practices, (6) civil conspiracy, and (7) violation of North Carolina's Mortgage Lending Act. Plaintiffs assert the following claims against the Appraisers: (1) negligence, (2) negligent misrepresentation, (3) fraud, (4) unjust enrichment, (5) violation of North Carolina's RICO statute, (6) civil conspiracy, and (7) unfair and deceptive trade

practices. In addition to compensatory damages, plaintiffs seek a preliminary injunction to prevent foreclosure on the subject properties, rescission of the underlying sales contracts, treble damages for unfair and deceptive trade practices, and punitive damages against both parties.

Plaintiffs premise each of their claims against BB&T on allegations that the bank wrongfully omitted information about the loan and appraisal process, most specifically, that faulty appraisals significantly overstated the value of the investment properties and that the bank had a duty to discover and disclose this information.[6] Plaintiffs do not allege that BB&T or the Appraisers made any direct

---

[6] The complaint reveals, *inter alia*, that each of plaintiffs' stated claims is "premised upon wrongful omissions by BB&T regarding the loan and appraisal process" and relies upon faulty appraisal information therein as follows:

(1) Plaintiffs' Mortgage Lending Act violation claim relies on allegations of BB&T's "misrepresenting or concealing material facts for the purpose of influencing, persuading, or inducing the Plaintiffs to take a loan" and that BB&T "improperly influenc[ed] the . . . reporting, result, and/or review of real estate appraisals."

(2) Plaintiffs' duty of good faith and fair dealing claim relies on allegations that "BB&T was aware, or should have been aware, of the fact that the Plaintiffs were being misled and/or induced to enter into the contracts in ignorance of facts materially increasing the risks," and that BB&T was aware of "fraudulent and inflated appraisals," but "failed to inform the Plaintiffs of such facts as required by its duty of good faith and fair dealing."

(3) Plaintiffs' RICO claim relies on allegations that BB&T's "misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving the Plaintiffs and obtaining their money for . . . pecuniary gain," and that BB&T "rel[ied] upon fraudulent . . . appraisals of the property."

(4) Plaintiffs' conspiracy claim relies on allegations that BB&T entered into an agreement "to commit . . . unlawful acts, practices, plans, schemes, and transactions to defraud and mislead Plaintiffs," that the agreement ensured that BB&T "would rely upon the [fraudulent] appraisals," and that defendants would "control the appraisal and lending process."

(5) Plaintiffs' fraud claim relies on allegations that BB&T was "under a duty to disclose the truth regarding all defendants' misrepresentations and concealed material

representations to them. Plaintiffs do not allege that they received, requested, or inquired about an appraisal at any time before purchasing the investment properties or that they were prevented from so doing. Plaintiffs do not allege that the sales were contingent on financing or an appraisal. In fact, of the remaining properties at issue in this action, the complaint reveals that BB&T ordered only two appraisals for their own internal purposes.

On 28 June 2010, BB&T and the Appraisers moved to dismiss the complaint for failure to state a claim under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. On 1 June 2011, the trial court denied plaintiffs' motion for a preliminary injunction to prevent foreclosure proceedings, concluding, *inter alia*, that plaintiffs failed to demonstrate a likelihood of success on the merits of their claims because a lender does not generally owe its borrower a duty beyond the lender's contractual obligations. *Anderson v. Coastal Cmtys. at Ocean Ridge Plantation, Inc.*, No. 09 CVS 1042, ¶¶ 14-24 (N.C. Super. Ct. Brunswick County June 1, 2011).

---

facts of which only they knew or could have known, and to make a full and open disclosure of all such information," and that BB&T approved and disbursed money at closing "notwithstanding their knowledge of and dependence upon the fraudulently overstated appraisals."

(6) Plaintiffs' unfair and deceptive trade practices claim relies on allegations that BB&T's "conduct, as alleged [in the aforementioned claims by reference], constitutes unfair and/or deceptive acts or practices."

(7) Plaintiffs' unjust enrichment claim relies on allegations that "inequitable enrichment, benefits, and ill-gotten gains [were] acquired as a result of the" omissions alleged in the aforementioned claims, and that plaintiffs' purchases were at "inflated prices."

On 27 June 2011, the trial court entered an opinion and order concluding that all claims against BB&T were "premised upon wrongful omissions by BB&T regarding the loan and appraisal process," but that "BB&T did not owe Plaintiffs a duty to disclose the details of the loan process not required to be disclosed under state or federal law or under the terms of the loan agreements." The trial court granted BB&T's motion to dismiss. *Anderson*, 2011 WL 2381781, ¶¶ 16-20 (N.C. Super. Ct. June 3, 2011). On 13 June 2012, the trial court entered an opinion and order concluding, *inter alia*, that plaintiffs could not have relied upon appraisals they did not receive, or that did not in fact exist, at the time of their decisions to purchase and thus granted the Appraisers' motion to dismiss on all claims. *Anderson*, 2012 WL 1948767, ¶¶ 59-61, 124 (N.C. Super. Ct. May 30, 2012).[7] On 16 May 2014, plaintiffs appealed, and on 10 October 2014, this Court certified the case for review prior to determination in the Court of Appeals. N.C.G.S. § 7A-31(a), (b)(2) (2013); N.C. R. App. P. 15(e)(2).

---

[7] The record indicates the following plaintiffs were voluntarily dismissed from this action without prejudice: John Merritt on 10 July 2012; John Swann and Lisa Swann (referred to in the amended complaint as plaintiffs "Swan"); Audrey Varnum, Richard Varnum, and Lucas Wilson on 15 February 2013; and Steve Chaney and Barry McGoff on 21 March 2014. Deborah Charuk, William Charuk, Maria Curatolo, Kathleen Jordan, Thomas Jordan, Tanner Markley, and Joel Schenkel voluntarily dismissed without prejudice their claims against Saunders, TMC, and his corporate entities in April 2014. We take notice of plaintiffs' attorneys' motion to withdraw as counsel for Kenneth Arnesen, Alan Walbaum, and Camille Walbaum dated 3 May 2013, which appears to remain pending at the trial court. N.C. R. App. P. 14(c)(1).

In essence, plaintiffs argue that they would not have purchased the properties but for faulty appraisal information. Plaintiffs claim that the underlying appraisals were the key to Saunders's complex scheme to sell undeveloped real estate to investors at "grossly inflated prices" and that, using this faulty information, Saunders controlled the entire loan process from application to appraisal to closing. Plaintiffs argue, essentially, that BB&T owed them a legal duty, resembling a fiduciary duty, created either by the general relationship between a bank and its borrower, the duty of good faith and fair dealing, or by the Mortgage Lending Act (MLA). Plaintiffs argue BB&T breached this duty by, *inter alia*, "concealing material facts for the purpose of influencing, persuading, or inducing the Plaintiffs to take a loan." Similarly, plaintiffs assert that the Appraisers breached a duty of care owed to them when they prepared faulty appraisals for the bank.

It is undisputed, however, that plaintiffs decided to purchase the investment properties without consulting an appraisal. Moreover, plaintiffs obligated themselves to purchase the properties independent of the loan process. Plaintiffs have not alleged that they ordered, viewed, or requested appraisal information at any time, or that they were prevented from doing so. Furthermore, of the properties remaining at issue in this action, the complaint reveals that BB&T obtained only two appraisals for its own internal underwriting purposes. As alleged, all misrepresentations during the sales process, if any, were made by Saunders, not by BB&T or the Appraisers.

As such, BB&T is entitled to dismissal of all claims because plaintiffs' complaint reveals an absence of both law and facts necessary to establish that the bank owed a duty to disclose the information that plaintiffs contend was wrongfully omitted. Moreover, plaintiffs have failed to sufficiently allege justifiable reliance on any omission by the bank before they purchased the investment properties and have failed to sufficiently establish that any action by BB&T was the proximate cause of their harm.

Dismissal of an action under Rule 12(b)(6) is appropriate when the complaint "fail[s] to state a claim upon which relief can be granted." N.C.G.S. § 1A-1, Rule 12(b)(6) (2013). "[T]he well-pleaded material allegations of the complaint are taken as true; but conclusions of law or unwarranted deductions of fact are not admitted." *Sutton v. Duke*, 277 N.C. 94, 98, 176 S.E.2d 161, 163 (1970) (quoting 2A James Wm. Moore et al., *Moore's Federal Practice* ¶ 12.08 (2d ed. 1968)). When the complaint on its face reveals that no law supports the claim, reveals an absence of facts sufficient to make a valid claim, or discloses facts that necessarily defeat the claim, dismissal is proper. *Wood v. Guilford County*, 355 N.C. 161, 166, 558 S.E.2d 490, 494 (2002) (citation omitted). We review appeals from dismissals under Rule 12(b)(6) de novo. *Bridges v. Parrish*, 366 N.C. 539, 541, 742 S.E.2d 794, 796 (2013).

In an ordinary debtor-creditor transaction, the lender's duties are defined by the loan agreement and do not extend beyond its terms. *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 368, 760 S.E.2d 263, 266-67 (2014) (citations omitted). This Court

has held on many occasions that "[o]ne who executes a written instrument is ordinarily charged with knowledge of its contents." *Ussery v. Branch Banking & Trust Co.*, ___ N.C. ___, ___, 777 S.E.2d 272, 279 (2015) (citation omitted). A fiduciary duty generally arises when one reposes a special confidence in another, and the other "in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Dallaire*, 367 N.C. at 367, 760 S.E.2d at 266 (quoting, *inter alia*, *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001)). "[T]he law does not typically impose on lenders a duty to put borrowers' interests ahead of their own," *id.* at 368, 760 S.E.2d at 267, though "it is possible, at least theoretically, for a particular bank-customer transaction to 'give rise to a fiduciary [relationship] given the proper circumstances,' " *id.* at 368, 760 S.E.2d at 267 (quoting *Branch Banking & Trust Co. v. Thompson*, 107 N.C. App. 53, 61, 418 S.E.2d 694, 699, *disc. rev. denied*, 332 N.C. 482, 421 S.E.2d 350 (1992)). Here plaintiffs fail to allege any special circumstances that could establish a fiduciary relationship. Plaintiffs' allegations establish nothing more than a typical debtor-creditor relationship, wherein any duty would be created by contract through the loan agreement.

Even if a plaintiff can show circumstances giving rise to a duty beyond the four corners of the loan agreement, absent a sufficient allegation and showing of justifiable reliance, a plaintiff's negligence claims fail. *See id.* at 369, 760 S.E.2d at 267. "Reliance is not reasonable if a plaintiff fails to make any independent

investigation," *id.* at 369, 760 S.E.2d at 268 (quoting *State Props., LLC v. Ray*, 155 N.C. App. 65, 73, 574 S.E.2d 180, 186 (2002), *disc. rev. denied*, 356 N.C. 694, 577 S.E.2d 889 (2003)), or fails to demonstrate he was "prevented from doing so," *id.* at 370, 760 S.E.2d at 268. Further, a plaintiff must establish that the lender proximately caused his injury. *See, e.g.*, *Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 88-90, 747 S.E.2d 220, 226-27 (2013).

The MLA, which was enacted by the General Assembly in 2001,[8] applied solely to loans "primarily for personal, family, or household use, primarily secured by either a mortgage or a deed of trust on residential real property located in North Carolina." N.C.G.S. § 53-243.01(15) (2005) (repealed 2009); *see also Fazzari v. Infinity Partners, LLC*, ___ N.C. App. ___, ___, 762 S.E.2d 237, 243 (2014) ("The MLA applied to residential loans and was intended to protect residential borrowers." (citation omitted)). The operative provisions of the MLA during the relevant period here are:

> § 53-243.11. Prohibited activities.
>
> In addition to the activities prohibited under other provisions of this Article, it shall be unlawful for any person in the course of any mortgage loan transaction:
>
> (1) To misrepresent or conceal the material facts or make false promises likely to influence, persuade, or induce an applicant for a mortgage loan or a mortgagor to take a mortgage loan, or to pursue a course of misrepresentation through agents or otherwise.

---

[8] Act of Aug. 23, 2001, ch. 393, sec. 2, 2001 N.C. Sess. Laws 1425, 1425-40, *repealed and recodified by* Act of July 22, 2009, ch. 374, 2009 N.C. Sess. Laws 681 (titled "North Carolina Secure and Fair Enforcement (S.A.F.E.) Mortgage Licensing Act") (codified as amended at N.C.G.S. §§ 53-244.010 to 53-244.121).

. . . .

> (8)  To engage in any transaction, practice, or course of business that is not in good faith or fair dealing or that constitutes a fraud upon any person, in connection with the brokering or making of, or purchase or sale of, any mortgage loan.
> . . . .
>
> (11)  To influence or attempt to influence . . . the development, reporting, result, or review of a real estate appraisal sought in connection with a mortgage loan.

N.C.G.S. § 53-243.11 (2005) (repealed 2009).

The MLA does not apply here because plaintiffs fail to allege that they purchased the properties for "personal, family, or household use," and the complaint indicates they purchased nothing more than undeveloped real estate, characterized as an "investment." *See Fazzari*, ___ N.C. App. at ___, 762 S.E.2d at 243 (finding the MLA inapplicable when the "Plaintiffs' own complaint describes the sale of the founders' lots as an 'Investment Scheme' and consistently refers to the investment purchasers as 'investors'"). Plaintiffs purchased the undeveloped lots from Saunders, marketed as an "investment" and for its "good investment potential." In fact, some individual plaintiffs purchased multiple, noncontiguous lots. Further, plaintiffs could not have used the property for residential purposes at the time of purchase, or for some time thereafter, because infrastructure and amenities had yet to be built and were delayed well into the future. Saunders informed plaintiffs of these delays before plaintiffs closed on their loans with BB&T, as expressly acknowledged in their

signed receipts of the Property Reports. Plaintiffs' assertions that they did not read the Property Reports, or that the Reports were buried in hundreds of pages of disclosure material, are insufficient to bring their investment purchases within the ambit of the MLA. *See Ussery*, ___ N.C. at ___, 777 S.E.2d at 279.

BB&T could not have violated the MLA by acting in bad faith when it did not disclose information it did not have, was not asked to provide, or was not contractually obligated to produce. *See Suntrust Bank v. Bryant/Sutphin Props., LLC*, 222 N.C. App. 821, 833, 732 S.E.2d 594, 603 (concluding that the bank did not breach the covenant of good faith and fair dealing when the claimant failed to establish breach of the contract), *disc. rev. denied*, 366 N.C. 417, 735 S.E.2d 180 (2012); *see also Bicycle Transit Auth. v. Bell*, 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985) ("There is implied in every contract a covenant by each party not to do anything which will deprive the other parties thereto of *the benefits of the contract.*" (emphasis added) (quoting *Harm v. Frasher*, 5 Cal. Rptr. 367, 374, 181 Cal. App. 2d 405, 417 (1960))). Accordingly, plaintiffs' attempts to establish a breach of duty under the MLA or the duty of good faith and fair dealing fail.

In sum, plaintiffs' allegations are insufficient to establish that BB&T owed or breached any duty. Plaintiffs have not alleged that their investment purchases were contingent on an appraisal nor have they alleged breach of contract by the bank. The complaint reveals that plaintiffs obligated themselves to purchase the properties without consulting an appraisal. Because plaintiffs' claims depend upon BB&T's

alleged omission of appraisal information, which BB&T had no duty to provide, plaintiffs' claims, as pled, fail.

Even if we were to find here, for the first time, that debtor-creditor relationships give rise to some heightened duty, plaintiffs have not alleged that they inquired, or were prevented from inquiring, about the appraisal information, and thus they have not established justifiable reliance. *Dallaire*, 367 N.C. at 370, 760 S.E.2d at 268 (concluding that when the borrowers "put forth no evidence that they made inquiry or were prevented from doing so, they have failed to demonstrate [ ] justified reliance"); *see also Calloway v. Wyatt*, 246 N.C. 129, 135, 97 S.E.2d 881, 886 (1957) ("A sale of land will not be vitiated by false representations of the seller . . . where the purchaser had sufficient opportunity to examine the subject of the representations but made no examination or investigation, and was not prevented from so doing by any artifice of the seller . . . ." (quoting *Hays v. McGinness*, 208 Ga. 547, 547, 67 S.E.2d 720, 720 (1951) (syllabus by the court))).

Moreover, plaintiffs fail to allege actual reliance upon an appraisal at all and therefore, fail to establish proximate cause. *Fazzari*, ___ N.C. App. at ___, 762 S.E.2d at 243-45 (finding it well established that "the plaintiff must show actual reliance on the alleged misrepresentation in order to establish [proximate cause]" and denying relief when "the purchase contracts were not subject to any appraisal contingencies"). Accordingly, without establishing justifiable reliance or proximate cause, plaintiffs' claims fail. *See Bumpers*, 367 N.C. at 88-90, 747 S.E.2d at 226-27 (requiring actual

reliance to establish proximate cause element of an unfair and deceptive trade practices claim); *Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559, 568-71, 374 S.E.2d 385, 391-93 (1988) (noting that reasonable reliance must be shown to make a case for actionable fraud); *Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 555-56 (1988) (requiring a "measurable" benefit conferred upon and accepted by the defendant for an unjust enrichment claim); *Reid v. Holden*, 242 N.C. 408, 414-15, 88 S.E.2d 125, 130 (1955) (implying that proximate cause is required for civil conspiracy claim seeking damages caused by acts done by one or more conspirators); *Hoke v. E.F. Hutton & Co.*, 91 N.C. App. 159, 162-63, 370 S.E.2d 857, 859-60 (1988) (requiring actual reliance on the "predicate act" alleged in a complaint to establish proximate cause for federal RICO claim). Accordingly, BB&T is entitled to dismissal on all claims.

Similar to the allegations against BB&T, each of plaintiffs' claims against the Appraisers, as pled, depends on an alleged duty of care owed by the Appraisers, coupled with assertions that plaintiffs justifiably relied on their faulty appraisals and that the Appraisers proximately caused plaintiffs' injury.[9]  Because plaintiffs'

---

[9] The complaint reveals, *inter alia*, that each of plaintiffs' stated claims against the Appraisers seeks to impose a duty, assert justifiable reliance, or establish proximate cause as follows:

(1) Plaintiffs' negligence claim relies on allegations that the Appraisers "owed a duty to the Plaintiffs to exercise due care in the performance of the appraisals," that the Appraisers "communicat[ed] a misleading or fraudulent report," and that plaintiffs' "damages were reasonably foreseeable to the [Appraisers] and were proximately cause [sic] by the[ir] negligence."

complaint reveals an absence of both law and facts necessary to sufficiently allege that the Appraisers owed them a duty of care or to establish the substantive elements of a legally recognized claim, dismissal for the Appraisers on all claims is proper.

In *Raritan River Steel Co. v. Cherry, Bekaert & Holland* we reviewed in depth the duty an accountant owes to nonclients who make use of an accountant's prepared financial reports, and we find that case instructive here. 322 N.C. 200, 207-16, 367 S.E.2d 609, 613-18 (1988); *see also Ballance v. Rinehart*, 105 N.C. App. 203, 206-08, 412 S.E.2d 106, 108-09 (1992) (applying the tenets of *Raritan* to liability in the real estate appraisal context). An accountant who prepares financial reports for his client clearly owes a duty of care to his client, *Raritan*, 322 N.C. at 210, 214, 367 S.E.2d at

---

(2) Plaintiffs' negligent misrepresentation claim relies on allegations that their "interest in their . . . transaction places them within a limited class to whom the [A]ppraisers . . . owe a duty of due care," that plaintiffs "relied on the false and misleading information supplied by the [Appraisers]," and that their "reliance was justifiable."

(3) Plaintiffs' fraud claim relies on allegations that the Appraisers were "under a duty to disclose the truth regarding their misrepresentations" and that they delivered "false and misleading [appraisals]."

(4) Plaintiffs' RICO claim relies on allegations that, "[a]s a direct and proximate result [of the Appraisers' participation in the RICO scheme], the Plaintiffs have been injured in their business or property" and that the Appraisers "conduct[ed] . . . misleading and inflated appraisals of the property."

(5) Plaintiffs' unfair and deceptive trade practices claim relies on allegations that plaintiffs suffered damages "[a]s a proximate and direct result of the [Appraisers'] unfair and/or deceptive acts or practices" as alleged in the aforementioned claims.

(6) Plaintiffs' unjust enrichment claim relies on allegations that "inequitable enrichment, benefits, and ill-gotten gains [were] acquired as a result of the wrongful conduct" alleged in the aforementioned claims and that plaintiffs' purchases were "at inflated prices."

(7) Plaintiffs' conspiracy claim relies on allegations that the damages they sustained were "a direct and proximate result of the acts committed" by the Appraisers and that the Appraisers "artificially manipulate[d] the values of the properties."

614, 617; however, the duty may extend to "persons . . . whom [the accountant] knows and intends will rely on his opinion, or whom [the accountant] knows his client intends will so rely," *id.* at 214, 367 S.E.2d at 617. In the latter circumstance, "the accountant must know of his client's intent at the time the accountant audits or prepares the information." *Id.* at 210, 367 S.E.2d at 614. The duty does not extend "liability to all persons whom the accountant should reasonably foresee might obtain and rely on the accountant's work." *Id.* at 210, 367 S.E.2d at 615; *see id.* at 214, 367 S.E.2d at 617.

Further, liability will only extend if there is justifiable reliance. *Id.* at 209-10, 214, 367 S.E.2d at 614, 617. "[A] party cannot show justifiable reliance on information contained in audited financial statements without showing that he relied upon the *actual financial statements* themselves . . . ." *Id.* at 206, 367 S.E.2d at 612 (emphasis added). As discussed previously, to establish justifiable reliance a plaintiff must sufficiently allege that he made a reasonable inquiry into the misrepresentation and allege that he "was denied the opportunity to investigate or that he could not have learned [. . . the true facts] by exercise of reasonable diligence." *Dallaire*, 367 N.C. at 369, 760 S.E.2d at 267 (quoting *Pinney v. State Farm Mut. Ins. Co.*, 146 N.C. App. 248, 256, 552 S.E.2d 186, 192 (2001), *disc. rev. denied*, 356 N.C. 438, 572 S.E.2d 788 (2002)). Similarly, proximate cause in the appraisal context requires that "plaintiffs *actually relied* on defendant's appraisal report." *Alva v. Cloninger*, 51 N.C. App. 602, 611, 277 S.E.2d 535, 541 (1981). These limitations "hold accountants to a

standard that accounts for their contemporary role in the financial world . . . [while balancing] the need to protect them from liability that unreasonably exceeds the bounds of their real undertaking." *Raritan*, 322 N.C. at 215, 367 S.E.2d at 617.

Plaintiffs here fail to establish that the Appraisers owed them a duty of care. The complaint reveals that BB&T, not plaintiffs, hired the Appraisers to evaluate properties for the bank's own internal underwriting purposes; thus, BB&T, not plaintiffs, was the Appraisers' client. *See Fazzari*, ___ N.C. App. at ___, 762 S.E.2d at 242 ("[A]ppraisals and underwriting are for the benefit of the lenders, not for the borrowers."). At no time did plaintiffs engage, communicate with, or deal with the Appraisers directly, nor did plaintiffs receive, review, or request any information from the Appraisers. Likewise, plaintiffs have not sufficiently alleged that the Appraisers knew that BB&T intended to use the appraisals to benefit or influence plaintiffs in any way when they prepared them. *See Raritan*, 322 N.C. at 213, 367 S.E.2d at 616 ("[A]ccountants should not be liable in circumstances where they are unaware of the use to which their opinions will be put."). Because plaintiffs fail to establish a legal duty, their negligence claims against the Appraisers fail.

Moreover, even if we were to find that the Appraisers did owe plaintiffs a duty of care, plaintiffs fail to sufficiently allege that they justifiably relied upon any representation by the Appraisers, or lack thereof, or that the Appraisers proximately caused injury to plaintiffs. Plaintiffs assert, essentially, that they indirectly relied upon the Appraisers' faulty information because BB&T chose to close on their loans.

Plaintiffs' complaint fails to establish that they relied on *actual appraisals*; thus, plaintiffs fail to establish justifiable reliance and their negligence claims must fail. *See id.* at 205-07, 367 S.E.2d at 612-13. Further, because the complaint reveals that plaintiffs chose to purchase the properties independent of an appraisal and independent of their decision on whether and how to finance their purchases, plaintiffs' allegations are insufficient to establish that the Appraisers proximately caused injury to plaintiffs. Accordingly, plaintiffs' remaining claims fail. *See Alva*, 51 N.C. App. at 611, 277 S.E.2d at 541; *see also Bumpers*, 367 N.C. at 88-90, 747 S.E.2d at 226-27; *Myers & Chapman*, 323 N.C. at 568, 374 S.E.2d at 391; *Booe*, 322 N.C. at 570, 369 S.E.2d at 555-56; *Reid*, 242 N.C. at 414-15, 88 S.E.2d at 130; *Hoke*, 91 N.C. App. at 162-63, 370 S.E.2d at 859-60. In sum, dismissal of plaintiffs' claims against the Appraisers, as pled, was proper.

In conclusion, the complaint reveals that plaintiffs chose to invest in undeveloped real property without consulting an appraisal. For the properties at issue here, the bank ordered only a limited number of appraisals, which were for its own internal use. It is undisputed that plaintiffs did not view, request, or inquire about an appraisal before deciding to purchase the properties. Any representations regarding property development, investment potential, or the like were made by developer Saunders, not the bank or the Appraisers. Taking the well-pled material allegations of the complaint as true, BB&T and the Appraisers are entitled to

dismissal on all claims set forth in plaintiffs' complaint. Accordingly, we affirm the decision of the trial court.

AFFIRMED.


Justice HUDSON, concurring in part and dissenting in part.

I agree with the majority that these cases arose out of plaintiffs' purchase of certain real estate and that many of plaintiffs' claims were properly dismissed under Rule 12(b)(6). However, with respect to plaintiffs' claims against the appraiser defendants (James Powell, James Powell Appraisals, LLC, and Lynn Rabello) and the BB&T defendants (Branch Banking and Trust Company, and BB&T Collateral Service Corporation), I conclude that the claims for negligent misrepresentation (against appraiser defendants only), for unfair and deceptive acts and practices (UDAP) under Article 1 of N.C.G.S. Chapter 75 (against BB&T defendants only), and for fraud (against both groups) were sufficiently pleaded to survive dismissal. Finally, the trial court dismissed plaintiffs' claims for civil conspiracy against both sets of defendants because no underlying claims remained. Because I would hold that several claims do survive, I would allow the civil conspiracy claims against these defendants to go forward as well. Accordingly, I respectfully dissent as to these claims only.

## Plaintiffs' Claims against Appraisers

Among other claims against the appraiser defendants, plaintiffs alleged negligent misrepresentation and fraud, both of which include reliance as an element.[1] The majority repeatedly states that plaintiffs have failed to allege reliance; however, review of the complaint shows otherwise. "The tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 206, 367 S.E.2d 609, 612 (1988) (citations omitted). In asserting fraud claims plaintiffs must allege that the actions were "made with intent to deceive," *Rowan Cty. Bd. of Educ. v. U.S. Gypsum Co.*, 332 N.C. 1, 17, 418 S.E.2d 648, 658-59 (1992) (citations omitted). Defendants here argue that without reliance, there can be no actionable deception.

First, we must look at the critical allegations in the complaint related to plaintiffs' claims for negligent misrepresentation and fraud against the appraiser defendants. For purposes of our Rule 12(b)(6) analysis, we take these allegations as true:

**SEVENTH CLAIM FOR RELIEF**
**(Negligent Misrepresentation— Alternative Claim**
**- Defendants Powell, James Powell Appraisals and**
**Rabello)**

366. Plaintiffs reallege and incorporate by reference

---

[1] Plaintiffs also alleged claims against the BB&T defendants for fraud and unfair acts and practices under N.C.G.S. Chapter 75. These claims are discussed more extensively below, but any reliance elements contained in them should survive based on the following discussion.

all prior allegations of this Amended Complaint.

367. Alternatively, in the course of their business and profession, and in a transaction in which they had a financial interest, the Defendants James Powell Appraisals, Powell and Rabello supplied information to the Plaintiffs' lender for the benefit of the Plaintiffs, and the Defendants James Powell Appraisals, Powell and Rabello intended for the Plaintiffs and the Plaintiffs' lender to rely on that information for guidance or benefit in the business transaction.

368. The Plaintiffs' interest in their overall purchase transaction places them within a limited class to whom the appraisers, the Defendants James Powell Appraisals, Powell and Rabello, owe a duty of due care.

369. The information supplied by the Defendants James Powell Appraisals, Powell and Rabello, in the form of appraisals conducted, was false and misleading.

370. The Defendants James Powell Appraisals, Powell and Rabello failed to exercise reasonable care or competence in obtaining or communicating this false and misleading information.

371. Injury to the Plaintiffs and the other property purchasers in the Coastal Communities subdivisions, as a result of the appraisals conducted, was foreseeable to the Defendants James Powell Appraisals, Powell and Rabello.

372. Through the acceptance of the appraisals by their lender, the Defendant BB&T, the Plaintiffs relied on the false and misleading information supplied by the Defendants James Powell Appraisals, Powell and Rabello, and the Plaintiffs' reliance was justifiable.

373. The Defendants James Powell Appraisals, Powell and Rabello were aware and/or should have been aware of the importance of the appraisals to the Plaintiffs and the other property purchasers/borrowers in the Coastal Communities subdivisions and the reliance that the Plaintiffs and the other property purchasers/borrowers in the Coastal Communities subdivisions would place thereon.

374. The Plaintiffs' reliance caused the Plaintiffs to incur financial damage. Had the Defendants James Powell Appraisals, Powell and Rabello disclosed the true facts,

including the actual market value of the properties, the Plaintiffs would not have purchased the properties.

375. As a direct and proximate result of the negligent misrepresentation of the Defendants James Powell Appraisals, Powell and Rabello, the Plaintiffs have been damaged in an amount in excess of Ten Thousand Dollars ($10,000.00), with the precise amount to be determined at the trial of this matter.

## EIGHTH CLAIM FOR RELIEF
### (Fraud — All Defendants)

376. The Plaintiffs reallege and incorporate by reference all prior allegations of this Amended Complaint.

377. Under the control and direction of the Defendant Saunders, the agents and employees of various planned residential subdivisions in Brunswick County, North Carolina, including, but not limited to, Rivers Edge sections 9-11, 13-15, 17-19, promised and promoted seemingly legitimate investments in real estate while in actuality operating a highly successful scheme designed for the benefit of the Defendants Saunders, Gordon, Powell, Rabello, certain employees and/or executives of the Defendant BB&T and the various corporate entities of the Defendant Saunders, including the Defendants Rivers Edge, Coastal Communities, MAS Properties, and TMC, to the damage of the Plaintiffs and countless other property owners.

378. The Plaintiffs were individually approached and specifically targeted by the Defendants Coastal Communities and/or Rivers Edge by direct mail solicitation and special events as promotional techniques to induce likely and prospective purchasers or lessees to visit the subdivision or to purchase or lease a lot in the subdivision.

. . . .

381. In order to accomplish this scheme, under the control and direction of the Defendant Saunders, the agents and employees of the various corporate entities, including the Defendants Rivers Edge, Coastal

Communities, TMC, James Powell Appraisals and BB&T, mislead [sic] potential purchasers throughout one or more of the various facets of purchasing the property, arranged for and/or procured the financing for the fraudulent transactions.

382. Each Defendant is joined in this action as a co-conspirator. Liability arises from the fact that each Defendant entered into an agreement with the other Defendants to commit or to participate in the commission of all or part of the unlawful acts, practices, plans, schemes, and transactions to defraud and mislead Plaintiffs and other Coastal Communities property purchasers by: (i) artificially manipulating the values of the properties; (ii) entering into an arrangement with a local appraiser and lender in order to control the appraisal and lending process; (iii) using a fraudulent marketing strategy to create the false appearance of high demand and a false sense of urgency to purchase unimproved and undeveloped property with seemingly little risk; (iv) controlling the loan application and settlement process; and (v) misrepresenting the infrastructure and amenities to be developed.

383. Upon information and belief, the agents and employees of the various corporate entities under the control and direction of the Defendant Saunders, including the Defendants Coastal Communities and/or Rivers Edge, employed a marketing strategy to fraudulently lure buyers through the *misrepresentation* of: (i) the infrastructure and amenities to be developed, (ii) the availability of the property, and (iii) the degree of interest in the property.

384. Upon the Coastal Communities property owners' visits to the subdivision of Rivers Edge prior to their execution of the Sales Contracts, the Defendants Coastal Communities and/or Rivers Edge presented the Plaintiffs with various marketing materials, community maps, plats and other artistic representations outlining the Master Plan of the development. The information and representations provided by the Defendants Coastal Communities and/or Rivers Edge or their authorized agents, including, but not limited to, the marketing materials exhibited by the Defendants Coastal

Communities and/or Rivers Edge at the location and presented to the Plaintiffs, upon which the Plaintiffs relied, indicated *inter alia* that the subdivision of Rivers Edge offered various amenities, including a southern style clubhouse, property owners clubhouse with outdoor Jr. Olympic sized pool and heated indoor pool, outdoor hot tub, fitness center with steam room and sauna, tennis courts, 27 acre fresh water Palmer Lake with canoeing and kayaking, walking/nature trails and sidewalks through the community, private beach club, and other recreational amenities. Specifically, the new sections of Rivers Edge to be referred to as "Fairway Crossing" would contain an entrance gate, Palmer Lake and surrounding ponds, walking/nature trails and sidewalks surrounding the 11th, 12th, 13th and 14th holes of the Arnold Palmer golf course at Rivers Edge.

. . . .

386. Upon information and belief, the Defendant Saunders and/or the agents and employees of the various corporate entities under the control and direction of the Defendant Saunders, including the Defendants Coastal Communities and/or Rivers Edge, made an arrangement with a local appraiser, the Defendant Powell of the Defendant James Powell Appraisals, to ensure that appraisals would be generated using comparable sales of other properties marketed and sold by the Defendants Coastal Communities and/or Rivers Edge, at inflated prices.

387. Upon information and belief, in order to justify these sales prices for the Coastal Communities properties, the Defendants Powell, Rabello and James Powell Appraisals purposefully failed to consider sales prices for comparable lots outside of the Coastal Communities developments when establishing the appraised value of the lots and appraisals were performed on the property as-is, rather than subject to the extraordinary assumption that the developments would be completed as planned and promised, with infrastructure and amenities.

388. Upon information and belief, the Defendants

Powell, Rabello and James Powell Appraisals thereby engaged in the fabrication and use of fraudulently overstated appraisals to justify the financing of Coastal Communities properties.

389. Upon information and belief, the Defendant Saunders conducted and controlled the appraisal process with the Defendants Powell, Rabello and James Powell Appraisals, through the Defendant TMC, a private mortgage brokerage and corporate entity under the control and direction of the Defendant Saunders and the Defendant Gordon, Vice President and managing principal of the Defendant TMC.

390. Upon information and belief, the Defendants concealed their practice of manipulating appraised values from the Plaintiffs and other Coastal Communities property purchasers and utilized this practice at each one of their developments. Therefore, the Plaintiffs and other Coastal Communities property purchasers did not know and had no reason to know that the Defendants had manipulated the appraised value of the property.

. . . .

393. Because the Defendant Saunders and/or the agents and employees of the various corporate entities under the control and direction of the Defendant Saunders, including the Defendants Coastal Communities and/or Rivers Edge, only offered the advertised financial incentives to Plaintiffs who used the services of the Defendants TMC and Gordon and thereafter controlled the lending process through the Defendants TMC and Gordon, it was certain that the Defendant BB&T, the lender participating in the agreement to generate the inflated and manipulated appraisals, would be used.

394. Upon information and belief, the Defendant BB&T approved, funded and handled the loans for the Plaintiffs and the vast majority of Coastal Communities property purchasers from 2004 until 2007 and distributed over 400 million dollars in lot loans to Coastal Communities property purchasers in Brunswick County, North Carolina during this time.

395. Upon information and belief, the Defendant BB&T did not follow either industry standards or their own internal guidelines governing loan origination and underwriting when handling the loan applications of the Plaintiffs or other Coastal Communities property purchasers. The Defendant BB&T approved the majority of the loans without any contact to the applicants to justify the information received and paid the Defendant TMC for the referrals for each loan application, upon information and belief.

396. For several years, from on or about 2004 until on or about 2007, BB&T regional bankers continued issuing loans for Coastal Communities property owners in the lot loan program in order to meet their own BB&T expanding growth goals regardless of whether the loans should have been approved and/or the properties were being developed by the Defendant Saunders and his various corporate entities as represented to property owners.

397. The Defendant BB&T ensured that the vast majority of lot loans were approved and money disbursed at the closing of the Coastal Communities lot sales, notwithstanding their knowledge of and dependence upon the fraudulently overstated appraisals performed by the Defendant Rabello of the Defendant James Powell Appraisals to justify the inflated amounts of the lot loans, upon information and belief.

398. Upon information and belief, the Defendant BB&T's regional branch managers and/or loan officers then continued in bad faith to issue loans to the Plaintiffs and other Coastal Communities property purchasers in the lot loan program, relying on fraudulent appraisals, knowing that the loans were under-collateralized and knowing that the infrastructure and amenities of the developments were not being completed as promised, in order to meet their own BB&T expanding growth goals regardless of whether the loans should have been approved and/or whether the properties were being developed by the Defendant Saunders and his various corporate entities as represented to property owners.

399. All of the Defendants were under a duty to

disclose the truth regarding their misrepresentations and concealed material facts of which only they knew or could have known, and to make a full and open disclosure of all such information.

400. The silence and/or omission of the Defendants related to material matters known by the Defendants which they had a legal duty to disclose to the Plaintiffs and other Coastal Communities property purchasers.

401. In addition, the Defendants have taken affirmative steps to conceal material facts regarding the property purchase, appraisal process, and loan process from the Plaintiffs and other Coastal Communities property purchasers, who were unaware and unable to discover these material facts through their reasonable diligence.

402. With regard to the Defendant BB&T, the regional executives mentioned above (Glen Heintz, the regional retail banking manager and Jeff Etheridge, the regional president for BB&T) and local Brunswick County branch managers and/or loan officers (specifically, Brian Walker, Vi Jones, Connie Norton, and others) were under a duty to make such disclosures to the Plaintiffs and other Coastal Communities property purchasers. Instead, the executives, branch managers, and/or loan officers forced through the loan applications and benefited from the increased production from the "lot loan program," and received higher salaries and/or large yearly bonuses (anywhere from 30% to 100% of their salaries) through the Defendant BB&T's bonus system.

403. By concealing their conduct designed to artificially inflate the market for the sale of lots in the subdivision, including but not limited to the high-pressure and misleading sales tactics, appraisals that reached a pre-determined result and were otherwise deficient and designed to support an inflated purchase price, irregular and deceptive brokerage and lending practices, and affixing of excess revenue stamps to recorded deeds, as alleged herein, all Defendants, in essence, together and by their own acts and omissions, perpetrated a fraud on the market, including the Plaintiffs, which in fact inflated the market.

404. All of the Defendants' misrepresentations and/or concealments were reasonably calculated to deceive the Plaintiffs and other Coastal Communities property purchasers, in that all of the Defendants knew their representations and/or concealments were false or were made recklessly, without any knowledge of truth or falsity, as a positive assertion, and where all of the Defendants knew there was a duty to disclose all material facts, or where all of the Defendants were recklessly indifferent to their duty to disclose.

405. The Defendants' misrepresentations and/or concealments were done with the intent to deceive the Plaintiffs, and the Plaintiffs were in fact deceived by these misrepresentations and/or concealments. The Plaintiffs' reliance on the Defendants' false representations was reasonable.

406. The Plaintiffs have suffered actual damages as a result of their reliance on all of the Defendants' false representations and/or concealments. Had any of the Defendants disclosed the true facts, the Plaintiffs would not have purchased the property.

407. As a direct and proximate result of the Defendants' fraudulent conduct, the Plaintiffs have been damaged in an amount in excess of Ten Thousand Dollars ($10,000.00), with the precise amount to be determined at the trial of this matter.

In my view, these allegations are sufficient to withstand dismissal under existing North Carolina law.

The trial court found as follows:

[52] Plaintiffs in this case allege in substance that they indirectly relied on the appraisal reports. However, the North Carolina Supreme Court, in *Raritan*, held that indirect reliance will not support a claim for negligent misrepresentation. . . . (Footnote call number omitted.)

. . . .

[Trial Court summarizes our opinion in *Raritan*.]

[54] In sum, the court in *Raritan* affirmed dismissal of the plaintiff's negligent misrepresentation claim because the plaintiff did not *directly* rely upon the audit report in [sic] which it asserted was defective. Applying *Raritan* to the present case, Plaintiffs must allege that they relied directly on the appraisal reports themselves in order to plead sufficiently a claim for negligent misrepresentation. 322 N.C. at 205-06. Post-*Raritan*, claims for negligent misrepresentation that have failed to allege direct reliance have been susceptible to dismissal. (Internal citations omitted.)

. . . .

[Trial Court summarizes the precedent of the Court of Appeals on this issue.]

[59] Similar to the purchasers in *Williams* [*v. United Community. Bank*, 218 N.C. App. 361, 724 S.E.2d 543 (2012)], Plaintiffs in the instant case purchased lots in undeveloped, proposed residential communities. Further, Plaintiffs allege that Coastal Defendants and the banks controlled the loan and appraisal process. Indeed, the banks procured the appraisals and subsequently approved Plaintiffs' loan applications. Plaintiffs do not allege that they ever viewed or read the appraisal reports prior to signing their purchase contracts or closing on their loans. Instead, Plaintiffs' [sic] argue, in conclusory fashion, that they relied on the appraisals "regardless of whether they viewed the appraisal report" because "if the appraisal reports reflected fair market values below the purchase price, none of the Plaintiffs would have moved forward and closed the loan." More specifically, Plaintiffs allege that "[t]hrough the acceptance of the appraisals by their lender [BB&T], the Plaintiffs relied on the false and misleading information supplied by [Appraiser Defendants], and the Plaintiffs' reliance was justifiable." In other words, Plaintiffs contend that they indirectly relied on the appraisal reports because BB&T presumably reviewed the

> reports and decided to close on their loans, implying that the lots appraised for the value of the loans. Thus, because BB&T decided to close on their loans, Plaintiffs assumed that the appraisal reports supported the loans and were not defective. (Footnote call numbers omitted.)
>
> [60] Plaintiffs also allege, like the purchasers in *Williams*, that if Appraiser Defendants had disclosed any of the flaws in their appraisal reports or if Plaintiffs knew that the lots were overvalued, they would not have closed on their loans, and that they subsequently lost money as a result of the purchases. However, Plaintiffs' Complaint makes it clear that they were not involved in the appraisal process, which was instead controlled by Coastal Defendants and BB&T. Further, Plaintiffs do not allege that they viewed any of the appraisals prior to signing the purchase contracts, which in any event were not contingent upon the appraised values for the lots. Consequently, Plaintiffs do not, and cannot, allege that they ever relied upon any appraisal of the property before they agreed to purchase said property. Moreover, Plaintiffs do not allege that they viewed the appraisals before closing on their loans with BB&T. Actual reliance is particularly lacking as to certain Plaintiffs who allege that their appraisal was performed after they closed on the loans. (Footnote call numbers omitted.)

I do not agree with the trial court's interpretation of *Raritan River Steel*, although I recognize that it is the interpretation adopted by the Court of Appeals. However, we are not bound by that precedent, and I conclude that common sense and the plain language of our precedent lead to a contrary result. Consequently, I would hold that the allegations of reliance here are adequate to support these claims.

In 1981 the Court of Appeals decided *Alva v. Cloninger*, 51 N.C. App. 602, 277 S.E.2d 535 (1981). The plaintiffs there bought a house that turned out to have serious structural defects. *Id.* at 603-05, 277 S.E.2d at 536-37. They filed suit against the

appraiser, seeking damages. *Id.* at 603, 277 S.E.2d at 536. The defendant argued that he could not be liable for negligence because the plaintiffs were not in privity of contract with him. *Id.* at 604, 277 S.E.2d at 537. The Court of Appeals disagreed, noting that

> [t]he evidence established prima facie that plaintiffs' reliance upon the appraisal was, or should reasonably have been, expected by defendant. The evidence also warrants an inference that plaintiffs actually relied on defendant's appraisal report to NCNB and that defendant's failure to discover and disclose the alleged defects in the house was a proximate cause of plaintiffs' injury. Dr. Alva testified that the contract to purchase the house was conditioned upon his obtaining financing. . . . Dr. Alva also testified that he understood the loan was conditioned upon the appraisal and "assumed everything was all right when the loan was approved." Dr. Alva's assumption as to the import of the appraisal was substantiated by the testimony of witness McGhee, the lending officer, who said "[e]ither the repair work had to be done or we would have had to decline the loan application."

*Id.* at 611, 277 S.E.2d at 541 (alteration in original). Under the reasoning in *Alva*, plaintiffs here would have a claim against the appraiser defendants.

The question then becomes whether this Court's decision in *Raritan River Steel* overturned *Alva*. In my view, the answer is no. First, the facts of each case are distinguishable: *Alva* dealt with a situation similar to the one we have here—real estate appraisals—whereas *Raritan* involved auditors and financial reports. In *Raritan*, the plaintiff alleged that it obtained the information it used to value a company not from an actual audit of that company, but from information contained

in a report prepared by a third party. *Raritan*, 322 N.C. at 205, 367 S.E.2d at 612.

Given those facts, this Court "conclude[d] that a party cannot show justifiable

reliance on information contained in audited financial statements without showing

that he relied upon the actual financial statements themselves to obtain this

information." *Id.* at 206, 367 S.E.2d at 612. Second, that conclusion was based

> in part from an understanding of the audit report. . . .
> Isolated statements in the report, particularly the net
> worth figure, do not meaningfully stand alone; rather, they
> are interdependent and can be fully understood and
> justifiably relied on only when considered in the context of
> the entire report, including any qualifications of the
> auditor's opinion and any explanatory footnotes included
> in the statements.

*Id.* at 207, 367 S.E.2d at 613.

While the Court of Appeals has subsequently interpreted this precedent as

requiring direct reliance in all negligent misrepresentation claims, *see, e.g.*, *Fazzari*

*v. Infinity Partners, LLC*, ___ N.C. App. ___, 762 S.E.2d 237 (2014), I am not convinced

our holding in *Raritan* should be read so narrowly. Instead, I am more inclined to

follow the reasoning in *Alva*. Nothing in *Raritan* mandates direct reliance—*Raritan*

only mandates actual reliance. There the auditor relied on a summary of the

information contained in the report. Here the complaint alleges that the appraiser

defendants fabricated and overstated appraisals, and concealed from plaintiffs this

conduct, all of which became the basis for the approval of financing for plaintiffs'

purchases. In this way, plaintiffs allege they relied on the appraisals, regardless of

whether they personally viewed them. Additionally, unlike the summary report relied upon by the plaintiff in *Raritan*, the appraisals here are more like the audit of the original company that we concluded the plaintiff must have actually relied upon there in order to establish a claim. Plaintiffs here did not rely on "[i]solated statements" from a summary but rather on "the entire report." *See Raritan*, 322 N.C. at 207, 367 S.E.2d at 613.

Additionally, in *Raritan, id.* at 203, 209-10, 214-16, 367 S.E.2d at 611, 614-15, 617-18, this Court referenced the Restatement (Second) of Torts, a comment to which is pertinent here and states:

> g. *Information supplied directly and indirectly.* The person for whose guidance the information is supplied is often the person who has employed the supplier to furnish it, in which case, if it is supplied for a consideration paid by that person, he has at his election either a right of action under the rule stated in this Section or a right of action upon the contract under which the information is supplied. In many cases, however, the information is supplied directly to the person who is to act upon it although it is paid for by the other party to the transaction. Thus, when a vendor of beans employs a public weigher to weigh beans, the weigher, who gives to the vendee a certificate which through his carelessness overstates the weight of the beans, is subject to liability to the vendee for the amount that he overpays in reliance upon the certificate. *However, direct communication of the information to the person acting in reliance upon it is not necessary.* In the situation above the liability of the weigher would not be affected by his giving the certificate to the vendor for communication to the vendee.

Restatement (Second) of Torts § 552 (titled "Information Negligently Supplied for the Guidance of Others") (cmt. g (Am. Law Inst. 1977)) (emphasis added).  Here the appraisers are comparable to the "weigher" and their liability is "not . . . affected by [their] giving the certificate [appraisal] to the vendor [BB&T] for communication to the vendee [plaintiffs]."

Further, this conclusion is bolstered by common sense and everyday experience.  When buying a house, parties commonly understand that unless the house appraises for the contract price (at least), the lender will not approve a loan to finance the purchase.  Therefore, even though the appraisers here were hired by the lender, to which it supplied the appraisals, plaintiffs allege that the appraisals were essential to the transaction and were relied upon by the parties to the purchase.  In my view, the better reasoned approach allows such reliance to be either direct, if the buyer actually sees the appraisal, or indirect, as here.  And when, as here, the plaintiffs have specifically and repeatedly alleged such reliance, I would hold that the claims can proceed.

Applying these principles here, I would allow plaintiffs' claims for negligent misrepresentation and fraud to go forward because plaintiffs have sufficiently pleaded all necessary elements, including reliance.[2]  In my opinion, these allegations are sufficient to survive a Rule 12(b)(6) motion to dismiss.

---

[2] This reasoning does not apply to plaintiffs who closed on their loans before the appraisal was completed.  In that case, I do not include these plaintiffs as those who can

*HUDSON, J., concurring in part and dissenting in part*

## **Plaintiffs' Claims against BB&T**

Because it appears that under the Mortgage Lending Act (MLA), N.C.G.S. 53-243.11, the lender here owed a duty to these plaintiffs, I would allow several of plaintiffs' claims which allege this duty as a basis for liability on the part of BB&T to go forward. N.C.G.S. § 53-243.11 (2005) (repealed 2009 and recodified as amended at N.C.G.S. §§ 53-244.010 to 53-244.121).

Initially, I disagree with the majority's assertions that plaintiffs' purchases of these properties in residential communities fall outside the scope of the MLA. As amended and recodified in N.C.G.S. § 53-244.020, the purpose of the MLA is as follows:

> (a) Purpose. – A primary purpose of this Article is to protect consumers seeking mortgage loans and to ensure that the mortgage lending industry operates without unfair, deceptive, and fraudulent practices on the part of mortgage loan originators. Therefore, the General Assembly establishes within this Article an effective system of supervision and enforcement of the mortgage lending industry by giving the Commissioner of Banks broad administrative authority to administer, interpret, and enforce this Article and adopt rules implementing this Article in order to carry out the intentions of the General Assembly.

> (b) Construction. – It is the intent of the General Assembly that provisions of this Article be liberally construed to effect the purposes stated or clearly encompassed by the Article.

---

show reliance (even indirectly).

*Id.* § 53-244.020 (2013).[3]   Plaintiffs allege in their complaint that they sought mortgage loans for these purchases and that "BB&T at all times relevant herein was acting as a mortgage lender pursuant to [the MLA]."

The statute in effect during the events at issue here defined "[r]esidential real property" as "[r]eal property located in the State of North Carolina upon which there is located or is to be located one or more single-family dwellings or dwelling units." *Id.* § 53-243.01(19) (2005).   The majority opinion, as well as the complaint and the trial court, repeatedly refer to plaintiffs' purchases of real property in planned residential developments.  The majority's assertion that the MLA does not apply because plaintiffs "could not have used the property for residential purposes at the time of purchase" cannot be accurate; people frequently buy lots upon which to build residences, and the MLA surely applies to them.  Additionally, despite the majority's repeated characterization of plaintiffs as "investors," the complaint alleges no such thing.  None of the plaintiffs are described as an "investor" in the complaint; instead each of the plaintiffs is described as an individual "citizen and resident" who purchased property in a Brunswick County "subdivision" at issue here.  The only

---

[3] Although this language was not included in the version of the MLA in effect at the times pertinent to these events, most of the remaining language is identical or similar, tending to indicate a similar remedial purpose.  *See, e.g.*, *O & M Indus. v. Smith Eng'g Co.*, 360 N.C. 263, 268, 624 S.E.2d 345, 348 (2006) ("A remedial statute must be construed broadly 'in the light of the evils sought to be eliminated, the remedies intended to be applied, and the objective to be attained.'  *Puckett v. Sellars*, 235 N.C. 264, 267, 69 S.E.2d 497, 499 (1952).").

instances in which "investments" are mentioned are in plaintiffs' allegations that defendants marketed the lots as a "good investment." That the lots, if properly developed, could have been a sound investment does not deprive these purchases of their residential nature, nor does it remove them from within the scope of the MLA. In fact, for most people, their residence is their largest "investment," and the MLA is designed to protect that. Any duty arising out of the MLA should apply to the facts alleged here.

On this issue the trial court concluded:

> [16] The gravamen of Plaintiffs' Claims against BB&T is that the Bank had a duty under the MLA to appraise the collateral for the loans and inform Plaintiffs of the details of the loan process including Saunders' alleged involvement and selection of JPA as the appraiser. All of the Claims against BB&T are premised upon wrongful omissions by BB&T regarding the loan and appraisal processes, including Saunders' alleged involvement and control over both.
>
> [17] In the Preliminary Injunction Order, the court concluded that Plaintiffs failed to allege facts sufficient to show that BB&T acted improperly in issuing loans to purchasers of Coastal Communities Properties. The court noted that in an ordinary debtor-creditor relationship, a lender does not owe any duty to its borrower beyond the terms of the loan agreement. "[P]arties to a contract do not thereby become each others' fiduciaries; they generally owe no special duty to one another beyond the terms of the contract . . . ." *Branch Banking & Trust Co. v. Thompson*, 107 N.C. App. 53, 61 (1992). "A lender is only obligated to perform those duties expressly provided for in the loan agreement to which it is a party." *Lassiter v. Bank of North Carolina*, 146 N.C. App. 264, 268 (2001). (Footnote call numbers omitted.)
>
> [18] BB&T did not owe Plaintiffs a duty to disclose

the details of the loan process not required to be disclosed under state or federal law or under the terms of the loan agreements. BB&T acted properly in issuing loans to Plaintiffs and did not violate any duties owed to Plaintiffs under the terms of the loan agreements. The court CONCLUDES that when measured under the standards of Rule 12(b)(6), the allegations in Plaintiffs' Amended Complaints can not support their Claims against BB&T.

I disagree. Under N.C.G.S. § 53-243.11, it was prohibited for a lender

(1) To misrepresent or conceal the material facts or make false promises likely to influence, persuade, or induce an applicant for a mortgage loan or a mortgagor to take a mortgage loan, or to pursue a course of misrepresentation through agents or otherwise.

. . . .

(8) To engage in any transaction, practice, or course of business that is not in good faith or fair dealing or that constitutes a fraud upon any person, in connection with the brokering or making of, or purchase or sale of, any mortgage loan.

. . . .

(11) To influence or attempt to influence through coercion, extortion, or bribery, the development, reporting, result, or review of a real estate appraisal sought in connection with a mortgage loan.

N.C.G.S. § 53-241.11 (2005). The Court of Appeals has held that this statute created a legal duty owed to buyers. *Guyton v. FM Lending Servs., Inc.*, 199 N.C. App. 30, 681 S.E.2d 465 (2009). There the conduct alleged was that the lender had withheld information that the property purchased by the plaintiffs lay in a flood plain. The

plaintiffs sued for fraud, negligent misrepresentation, and unfair and deceptive trade practices. *Id.* at 33, 681 S.E.2d at 469. The Court of Appeals reasoned that, "[a]lthough N.C. Gen. Stat. § 53-243.11 does not directly address the specific set of factual circumstances present in this case, we conclude that this statutory provision was intended to protect buyers against the sort of activity that is alleged to have occurred here." *Id.* at 43, 681 S.E.2d at 475. The court concluded:

> Assuming that Defendant did, in fact, engage in the conduct described in Plaintiffs' complaint, Defendant would have clearly violated N.C. Gen. Stat. § 53-243.11. As a result, there is ample basis in North Carolina law . . . for concluding that Defendant would have violated a legal duty owed to Plaintiffs if it acted as described in Plaintiffs' complaint.

*Id.* at 44, 681 S.E.2d at 476. This reasoning equally applies here.

Plaintiffs assert claims for fraud and unfair and deceptive trade practices against BB&T, alleging that:

> 99. Upon information and belief, the Defendant Saunders and/or the agents and employees of the various corporate entities under the control and direction of the Defendant Saunders, including the Defendants Coastal Communities and/or Rivers Edge, made an arrangement with local lenders, including the Brunswick County, North Carolina, regional office of BB&T, to ensure that the lenders would rely upon the previously described appraisals which manipulated property values.
> 100. In addition, the Defendant BB&T financed early lot sales in the various undeveloped subdivisions with transactional values under $250,000.00, waiving the requirement of a full appraisal in most cases.
> 101. Upon information and belief, the Defendant BB&T's waiver of a full appraisal for the lots with

transactional values of under $250,000.00 did not comply with the requirements of the North Carolina Administrative Code and/or the Defendant BB&T's own internal underwriting guidelines.

. . . .

112. Upon information and belief, the Defendant BB&T approved, funded and handled the loans for the vast majority of Coastal Communities property purchasers from 2004 until 2007 and distributed over 400 million dollars in lot loans to Coastal Communities property purchasers in Brunswick County, North Carolina during this time.

113. Upon information and belief, the Defendant BB&T did not follow either industry standards or their own internal guidelines governing loan origination and underwriting when handling the loan applications of the Coastal Communities property purchasers.

114. The Defendant BB&T employs a standard practice whereby all loan applications submitted must be approved through their Central Underwriting department in Winston[-]Salem, North Carolina, upon information and belief. Nevertheless, upon information and belief, the decisions of the Defendant BB&T's Central Underwriting department may be overridden by the regional branches if deemed necessary on a case-by-case basis.

115. In the instant case, upon information and belief, many of the loan applications of the Coastal Communities property purchasers were turned down at BB&T's Central Underwriting department as a result of gaps in information, debt to income ratio and/or credit history in the loan applications of the Coastal Communities property purchasers submitted by TMC.

116. However, upon information and belief, Glen Heintz, the regional retail banking manager for the Defendant BB&T (for the region encompassing Brunswick County, North Carolina) and/or Jeff Etheridge, the regional president for the Defendant BB&T (for the region encompassing Brunswick County, North Carolina), chose to override the majority of the declines and approve the loan applications regardless of any issues or concerns noted

in the applications by the Defendant BB&T's Central Underwriting department.

117. As a result, in or about 2005, the Defendant BB&T's Central Underwriting department declined to review the loan applications of the Coastal Communities property purchasers from the Brunswick County region altogether because they determined that the Brunswick County region would override the majority of the declines and approve the loan applications regardless of their decisions, upon information and belief.

118. Upon information and belief, following this change in policy, BB&T Branch Managers throughout Brunswick County, specifically, Brian Walker, Vi Jones and Connie Norton, employed a "no phone call" policy in order to handle the numerous faxed applications being submitted by the Defendants TMC and Gordon (referred to hereinafter as "the lot loan program").

119. Upon information and belief, the loan applications were thereafter "forced through" and approved by the Defendant BB&T without any contact to the applicants to justify the information received.

120. The Defendant BB&T thereafter paid the Defendant TMC for the referrals for each loan application, upon information and belief. At the height of the program, the Defendant BB&T paid the Defendant TMC as much as $15,000.00 to $20,000.00 per month for the referrals, upon information and belief.

121. The above mentioned BB&T executives purposefully shifted the work with the "lot loan program" to younger retail lenders that were less inclined to question the internal adjustments made specifically for the program, upon information and belief.

. . . .

125. Thereafter, upon information and belief, the Defendant BB&T's regional branch managers/loan officers continued issuing loans for Coastal Communities property owners in the lot loan program in order to meet their own BB&T expanding growth goals regardless of whether the loans should have been approved and/or the properties

were being developed by the Defendant Saunders and his various corporate entities as represented to property owners.

. . . .

127. Upon information and belief, the Defendant BB&T continued in bad faith to provide loans to the Plaintiffs and other Coastal Communities property owners in the lot loan program, relying on fraudulent appraisals and knowing that the infrastructure and amenities in all of the developments were not being completed as promised.

. . . .

135. Instead, the Defendant BB&T failed to maintain adequate and appropriate compliance reviews of the appraisals which would have easily alerted the Defendant BB&T that the appraisals were flawed and the lot prices were inflated, upon information and belief. If, in fact, compliance reviews were performed, the Defendant BB&T knew or should have known that the reviews were performed in an inadequate and inappropriate manner, upon information and belief.

Like in *Guyton*, if we take these allegations as true, they certainly suffice to support a conclusion that BB&T breached a duty to plaintiffs here and therefore, any claims requiring such a duty as an element, as well as claims under Chapter 75, should be allowed to go forward.[4]

In sum, for the above reasons, I would allow plaintiffs' claims against the appraiser defendants for negligent misrepresentation and fraud to proceed, as well

---

[4] I am not inclined to go so far as to hold that the Mortgage Lending Act creates its own cause of action, however. Thus, I would hold that plaintiffs' claims on that cause were properly dismissed.

as plaintiffs' claims for fraud and for unfair and deceptive acts or practices under Chapter 75 to go forward against the BB&T defendants. Moreover, based on reviving these claims, I would allow the claims of civil conspiracy to proceed as to both sets of defendants.

Accordingly, I respectfully dissent from the majority opinion as to these claims only. I concur with the majority's decision regarding the remaining claims asserted by plaintiffs and addressed in the majority opinion.

Justice BEASLEY joins in this concurring in part, dissenting in part opinion.

Justice EDMUNDS concurring in part; and dissenting in part.

I join with that portion of the dissent that addresses plaintiffs' claims against defendants James Powell, James Powell Appraisers, LLC, and Lynn Rabello.

I also join that portion of the dissent that would find that the MLA applies to plaintiffs' purchase of real property, even if made primarily for investment purposes. However, because I do not believe that issue is dispositive of plaintiffs' claims against the BB&T defendants, I concur in the remainder of the majority opinion.